EATON CORPORATION, an Ohio corporation, Plaintiff,

v.

The MAGNAVOX COMPANY, a Delaware corporation, and Magnavox Government and Industrial Electronics Company, a Delaware corporation, Defendants.

Civ. No. 78–72118.

United States District Court, E.D. Michigan, S.D.

March 24, 1984.

Mark H. Sutton, Detroit, Mich., for plaintiff.

W. Robert Chandler, Detroit, Mich., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHILIP PRATT, District Judge.

This action arises from the performance of a contract between plaintiff Eaton Corporation ("Eaton") and defendants Magnavox Company and Magnavox Government and Industrial Electronics Company.[1] Eaton has filed a six-count complaint in connection with the performance of this contract.[2] Eaton claims that Magnavox's conduct constituted:

1. A breach of contract;

2. A breach of express warranty;

3. A breach of implied warranties;

4. Misrepresentation;

5. Negligence; and

6. The manufacture of a defective product.

Eaton originally sought both damages and declaratory relief.

---

1. The latter defendant is an operating division of the former, and is the division which performed this contract. Defendants will be referred to collectively as "Magnavox."

2. Eaton filed this action in the Wayne County Circuit Court. Magnavox removed it to this Court, on the basis that the parties are of diverse citizenship. 28 U.S.C. §§ 1332, 1441.

In a memorandum opinion and order issued on October 29, 1980, this Court denied without prejudice Eaton's claims for declaratory relief. A trial was had before the Court on January 4 through 25, 1983 on Eaton's remaining claims for damages. The Court now issues its findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

### A. *Introduction*

This dispute revolves around "controllers". A controller is an electronic mini-computer which consists of many small components soldered to a printed circuit board. As manufactured by Magnavox, the printed circuit board was encased in epoxy and enclosed in a metal housing. The controller is but one part of an "anti-lock" system which was manufactured by Eaton. An anti-lock system is designed to regulate electronically the application of brakes on a vehicle axle, in order to prevent the brakes from "locking". To accomplish this objective, a "wheel speed sensor" on each wheel sends an electronic signal to the controller. The controller processes these signals and sends a different signal to a solenoid and valve. The valve then regulates the functioning of the air brakes on the axle. When the controller detects that certain abnormal conditions exist, it sends a signal to a warning lamp which is installed in the dashboard of the vehicle. When the warning lamp is activated, the vehicle's driver is informed that these abnormal conditions are occurring.

Between 1973 and 1976, Magnavox manufactured controllers pursuant to its contract with Eaton.[3] Eaton, in turn, sold its anti-lock systems to original equipment manufacturers ("OEMs") of trucks. After some of the OEMs complained to Eaton that the anti-lock systems were not functioning correctly, Eaton concluded that the controllers built by Magnavox did not conform to Eaton specifications in at least two material respects. The OEMs notified the National Highway Traffic Safety Administration ("NHTSA") of the problems they had encountered, and Eaton instituted a recall of all of the controllers which had been installed in vehicles. After Magnavox refused to accept responsibility for the alleged defects in the controllers, Eaton filed this action.

### B. *Formation of the Contract*

In September, 1972 Curtis Eibling of Eaton contacted Richard Hoffman of Magnavox, to inquire as to whether Magnavox would be interested in manufacturing controllers for Eaton. Magnavox officials decided that they were interested in the project, and a series of negotiations ensued. In addition to Eibling and Hoffman, others involved in these negotiations were Warren Matthey of Eaton and J.T. Smith and William Nank of Magnavox.

On March 1, 1973, Eaton first issued a purchase order to Magnavox for the purchase of controllers. This purchase order, number 102–15–012, included all of Eaton's standard terms and conditions. Three of the paragraphs included in these standard terms stated as follows:

> 5. INSPECTION AND ACCEPTANCE: ... Acceptance of all or any part of the goods shall not be deemed to be a waiver of Buyer's right either to cancel or to return all or any portion of the goods because of failure to conform to this contract, or by reason of defects, latent or patent, or other breach of warranty, or to make any claim for damages, including manufacturing costs, damage to materials or articles caused by improper boxing, crating or packing, and loss of profits or other special damages occasioned the Buyer. Such rights shall be in addition to any other remedies provided by law.

\* \* \* \* \* \*

---

**3.** The only controllers which are involved in this dispute are the 12–volt tractor controllers which were built by Magnavox in its production "runs" one through twenty-six.

7. SELLER'S WARRANTIES: Seller hereby warrants that the whole of the goods furnished hereunder shall be of merchantable quality and fit for Buyer's purposes and that they shall conform with Buyer's instructions, specifications, drawings, and data. Seller hereby further warrants that the whole of the goods furnished hereunder shall conform to all representations, affirmations, promises, descriptions, samples, or models forming the basis of this contract. Seller agrees that these warranties shall survive acceptance of the goods. Said warranties shall be in addition to any warranties of additional scope given by Seller to Buyer. None of said warranties and no other implied or express warranties shall be deemed disclaimed or excluded unless evidenced by a purchase order change notice or revisions issued and signed by Buyer.

\* \* \* \* \* \*

12. INDEMNIFICATION: Seller further agrees to indemnify and save Buyer harmless from any and all losses, liabilities, damages, suits, actions, proceedings, subrogations, and expenses, including court costs and reasonable attorneys' fees, related in any way to this contract, or the services performed or goods delivered under this contract, except for goods manufactured entirely to Buyer's specifications, which are claimed or made by any person, firm, association, or corporation, including employees, workmen, servants, or agents of the Seller and his subcontractors arising from any cause or for any reason whatsoever. Seller further agrees, upon receipt of notification, to promptly assume full responsibility for the defense of any and all such suits, actions, or proceedings which may be brought against Seller or against Buyer. In the event Buyer's machinery or equipment is used by Seller in the performance of any work that might be required under this contract, such machinery or equipment shall be considered as being under the sole custody and control of Seller during the period of such use by Seller.

On March 2, 1973 Nank (M) * responded to this purchase order. Part of his response was a document entitled "Amendments to Eaton Corporation Purchase Order Terms and Conditions", which stated in part:

| Clause | Comment |
|---|---|
| 5 | Delete the fourth paragraph in its entirety and substitute the following:<br><br>"Buyer's acceptance of part of the goods shall not be deemed to be a waiver of Buyer's right either to cancel or to return any other portion of the goods because of failure to conform to this contract. However, Buyer's acceptance of goods will be considered to be final except as to latent defects, fraud or gross mistakes amounting to fraud." |
| 7 & 12 | Delete pending final negotiations on specifications, acceptance test details and MTBF. It is our present intent to warrant against defects in workmanship and material for a period of twelve months after delivery and to indemnify Eaton against non-conformances to specifications but in no instance will Magnavox accept responsibility for consequential damages. |

Eaton's first purchase order did not result in the formation of a contract between Eaton and Magnavox. On June 27, 1973 Nank (M) sent Eaton a second proposal for the manufacture of controllers. Nank's letter stated that this proposal was made "subject to the comments submitted on 2 March 1973 pertaining to Terms and Conditions." On July 20, 1973 Eaton issued a second purchase order, number 102–15–012. Attached to this purchase order were the same standard terms and conditions which had been part of Eaton's first purchase order.

Nank returned a signed copy of this purchase order to Eaton on July 25, 1973. In an attached letter, he repeated the amend-

---

\* For the reader's convenience, where the context does not identify a name with a party, (M) will indicate a Magnavox employee and (E) an Eaton employee.

ments to Eaton's standard terms which he had requested earlier. After reciting these requested amendments, he stated: "Please let me know if these changes are acceptable."

The issuance of this second purchase order also failed to result in the formation of a contract. The contract was finally executed as the result of a meeting on March 1, 1974. Present at this meeting were Matthey (E), Nank (M), and Edward Byer of Magnavox. At this meeting Eaton cancelled its first two purchases orders and issued a third, number 102–15–066. This purchase order required Eaton to purchase from Magnavox "a minimum of 35% of its aggregate controller requirements for the two-year period beginning with the effective date of FMVSS 121 [4] providing that all units meet Eaton-Brake Division specs and that all prices remain reasonably competitive in comparison to domestic competition." Attached to the purchase order was a copy of Nank's (M) letter of July 25, 1973, in which he had repeated Magnavox's requested changes in the terms of the purchase order. Under the portion of the letter where Nank had stated: "Please let me know if these changes are acceptable," Matthey (E) wrote: "OK W.A. Matthey 3–1–74".

Therefore, the terms of the contract between Eaton and Magnavox consisted primarily of Eaton's standard terms, as modified by the requests made by Nank (M) on March 2 and July 25, 1973.[5] The only exception is that in February, 1977, the parties agreed to extend the warranty period from twelve to fifteen months. *See* Exhibit 38 to deposition of James W. Fahey. All of the controllers manufactured by Magnavox were made pursuant to this purchase order and were subject to these terms. During the contract negotiations, the parties never discussed the meaning of Magnavox's promise to "indemnify Eaton against nonconformances to specifications", nor did they define the term "consequential damages". They never discussed what Magnavox's liability would be if Eaton were required to institute a recall of the controllers for any reason. Magnavox was aware, however, that the controllers were to be used in Eaton's anti-lock systems, that they would be installed on trucks, and that they would be difficult to repair once installed.

### C. Selection of Parts and Production of the Controllers

During the early negotiations which took place between September 1972 and March, 1973, Eaton officials supplied Magnavox with a list of the components which Magnavox was to use in manufacturing the controllers.[6] In this list, Eaton specified that all except one of the operational amplifiers ("op amps")[7] should be "LM 1458N"s, a component which was manufactured by National Semiconductor.[8]

During these early meetings, Eibling (E) showed Hoffman (M) a sample of the controllers then being manufactured for Eaton by Sylvania Corporation. Hoffman took a

---

**4.** Federal Motor Vehicle Safety Standard 121 is a federal regulation which requires the installation of anti-lock systems on trucks. 49 C.F.R. § 571.121.

**5.** A copy of the contract language is attached to this opinion as Appendix A. Underlined text represents the additional language requested by Magnavox. Text which has been struck over represents the standard Eaton terms which were deleted pursuant to Magnavox's request. The remaining text represents the standard Eaton terms to which Magnavox did not object.

**6.** Magnavox played no role in designing the electronic functions of the controller. Eaton employees designed the controller, and Eaton furnished Magnavox with schematic drawings and lists of the electronic components to be used. Magnavox's role was to manufacture the electronic circuits in conformance with Eaton's design. As part of this role, Magnavox designed the physical arrangement of the components on the printed circuit board.

**7.** An op amp is an integrated circuit which receives an electronic input, and modifies that input by performing some sort of mathematical operation. The modified input is then released as an output.

**8.** The controllers contained one additional op amp of an entirely different design. There is no dispute in this action involving this additional op amp. All subsequent references to op amps will refer only to the op amps originally specified by Eaton to be LM 1458Ns.

photograph of this sample controller. He later found that instead of LM 1458Ns, this sample contained RC 4558DNs, a different op amp which is manufactured by Raytheon Company.

Nevertheless, the last parts list which Eaton submitted to Magnavox prior to Magnavox's initial bid on the project called for the use of six components described as "LM 1458 Dual Operational Amplifier or approved equivalent." In calculating the costs of producing the controller, Magnavox used a price it had obtained for "LM 1458N"s manufactured by National.

Several additional parts lists were exchanged by Eaton and Magnavox during contract negotiations, and indeed throughout the production of the controllers by Magnavox. On March 16, 1973, Eibling and E. James Lane of Eaton told Magnavox that Magnavox should seek alternate vendors for each of the components to be used in manufacturing the controllers, in order to reduce the costs of production. On April 25, 1973, Magnavox received another parts list from Eaton which called for National LM 1458Ns.

At some point during this period, Harry Gill visited Magnavox. Gill was a design engineer for Raytheon, and he had invented the RC 4558DN. During his visit, he explained the differences between the RC 4558DN and the RC 1458DN. The primary difference, he explained, was that the 4558's input transistor had a PNP input bias current while the 1458's input transistor had an NPN input bias current.[9] Gill testified as to the foregoing when he was deposed by the parties in 1982. He could not recall who was present at his visit at Magnavox. He testified that at some time between February, 1972 and April, 1973. Raytheon had modified the design of the 4558 so that it had a PNP input bias. He testified that prior to that time, the 4558 had an NPN input bias. Raytheon modified the design because an op amp with a PNP input bias could be manufactured at a lower cost. Gill further testified that in "ninety-nine percent of the applications",

an op amp would perform the same functions regardless of whether its input bias was PNP or NPN. Gill deposition at 72. He did not testify, however, that he informed Magnavox personnel to this effect when he visited them in 1973.

On May 29, 1973, Magnavox prepared its own parts list for the controller. This list called for the use of "LM 1458N"s and listed as manufacturers of this component Motorola, Raytheon, Signetics, and National. As mentioned above, one of Magnavox's early proposals to Eaton was contained in a letter from Nank (M) to Matthey (E), dated June 27, 1973. Attached as a part of Magnavox's proposal was a parts list prepared by Magnavox. This list called for "LM 1458N"s and listed as manufacturers Motorola, Raytheon, Signetics, National, MIL, and Fairchild.

Between May and July, 1973, Magnavox conducted tests on the components which it was receiving from its vendors, including the op amps. Among other tests, Magnavox tested the input bias current of the op amps, to determine whether these components met their manufacturers' specifications.

As contract negotiations were continuing between May and August, 1973, Magnavox delivered to Eaton twenty prototype controllers. Magnavox used both National LM 1458Ns and Raytheon RC 4558DNs in manufacturing these prototypes. Between September, 1973 and January, 1974, Magnavox delivered to Eaton approximately two hundred "pre-production" controllers. Like the prototypes, these pre-production models contained both 1458s and 4558s.

Both Eaton and Magnavox anticipated that Magnavox would use more than one source to obtain the op amps to be used in the controllers. In mid-1973, Magnavox concluded that it preferred to use one part number to refer to all of these op amps, whatever their source. Accordingly, in August, 1973 Hoffman (M) prepared a part drawing number 619937–101. Thereafter,

---

**9.** The "input bias current" refers to the polarity of the electrical current at the input of the op amp. Current flows into an NPN input transistor; it flows out of a PNP input transistor.

Magnavox frequently used this number to refer to the op amps.

Magnavox preferred this method of numbering for two reasons. First, Eaton had specified that the op amps should function over an extended temperature range, and that they should be "burned in" [10] before they were installed in the controllers. A designation of an "LM 1458N", standing alone, did not incorporate these special requirements. Magnavox's drawing, on the other hand, did incorporate these requirements. Second, Magnavox's internal policies called for the use of one number for all equivalent parts, even if they were furnished by more than one manufacturer. Therefore, Magnavox wanted to use number 619937-101 to refer to all of the op amps used in the controllers, regardless of who had manufactured them.

Hoffman (M) selected the parts which were included in this drawing. In addition to parts manufactured by Signetics, Motorola, and Microsystems,[11] he selected the National LM 1458N and the Raytheon RC 4558DN. After making an investigation, Hoffman had determined that these five parts were equivalent and that each would meet Eaton's requirements. As a part of this investigation, Hoffman compared the specifications contained in National and Raytheon catalogs.[12] He did not compare the schematic drawings contained in these catalogs, or the input bias current of the two devices.[13] Hoffman testified at trial that he considered an op amp to be nothing more than a "black box", and that he was not interested in its internal circuitry so long as it met its performance specifications.

In September, 1973, Fred Williams of Eaton visited Magnavox. Hoffman (M) testified that Williams was given all of Magnavox's internal part drawings during this visit. Neither Hoffman nor any other witness, however, could recall specifically whether Magnavox's drawing number 619937 was shown or given to Williams at this time. On September 28, 1973, Williams wrote in an internal Eaton memo that Eaton employees were checking all available sources for controller components, to ensure that all relevant specifications were acceptable.

On October 18, 1973, Eaton internally released for "tooling" one design for its controller. The parts list which was released by Eaton that day called for "National LM 1458N"'s.

In December, 1973, Richard Hossman replaced Hoffman as Magnavox's project engineer in charge of the anti-lock program. On July 31, 1974, Williams (E) wrote to Nank to authorize Magnavox to begin production of the controllers. In his letter, Williams stated that "all correspondence related to any Magnavox supplied components of Eaton Skid Control Systems dealing with changes to components or circuits must be either authored by or countersigned by Fred Williams." [14] Plaintiff's Exhibit 36A. In October, 1974, Magnavox began production of the controllers.

Throughout the entire pre-production phase of their business relationship, Eaton and Magnavox had many informal contacts. Many contacts were made via telephone, without any written documentation as to their content. When changes in design

---

**10.** An op amp is burned in by running an electrical current through it for a period of time before it is installed in a device. This process eliminates from use those op amps which develop early failures.

**11.** These were, respectively, the N5558V, the MC 1458CPI, and the ML 1458S.

**12.** Raytheon's catalog states that either the RC 1458DN or the RC 4558DN is a "Raytheon Direct Replacement" for the National LM 1458N. Defendants' Exhibit Q2 at vi.

**13.** Eaton had never informed Magnavox that the National LM 1458N had an NPN input bias, nor that this was an important characteristic.

**14.** Neither Eaton nor Magnavox complied fully with this policy. On August 26, 1974, Gale Krawczak of Eaton wrote to Nank and made several changes in the components used in the controllers. On October 24, 1974, Hossman (M) wrote to Krawczak regarding problems that Magnavox had experienced with Fairchild op amps. Hossman stated that these op amps were being tested and that "Magnavox will approve or disapprove Fairchild as a supplier." Plaintiff's Exhibit 41.

*were* documented in writing, the documentation often occurred only after the changes had taken place. On November 4, 1974, William Deibel of Eaton wrote to Smith (M) and noted that "both of us may have relaxed some of the basic business controls normally followed in less hectic circumstances." Exhibit 7 to Deibel deposition. Deibel requested that the parties develop "a more formal policy regarding our commitments to you lest any misunderstandings develop ...". *Id.* Deibel later testified that this letter was prompted by Eaton's concern that Magnavox had often performed work without prior authorization from Eaton, and then billed Eaton for such work. Deibel testified that Eaton officials believed that they should not have been required to pay for such work, but that they did so to ensure Magnavox's future cooperation.

On November 22, 1974, Hossman (M) wrote to Krawczak (E) and enclosed a revised copy of Magnavox's parts list for the controllers. This list called for the "LM 1458N"s and listed Motorola, Raytheon, Signetics, National, MIL, and Fairchild as manufacturers of this component.

On December 5, 1974, Eaton and Magnavox employees met. At this meeting it was mentioned that Magnavox was using Raytheon op amps exclusively in manufacturing the controllers. It was not mentioned, however, which model Raytheon op amps were being used.

On January 14, 1975, Hossman wrote to Robert Medler at Eaton to propose a different method of burning in the op amps. In this letter, Hossman stated that Magnavox's part number 619937–101 represented a burned-in "LM 1458N". Hossman also stated that Magnavox had produced 14,000 controllers as of that date, and had used 94,000 "LM 1458Ns".

On January 20, 1975, Hoffman wrote to Krawczak and stated that Magnavox had performed experiments to achieve cost reductions in the controllers. He stated that in one of these experiments, Magnavox had replaced the "LM 1458 Op Amps" in the controller.

On January 24, 1975, Eaton prepared a revised parts list. This list called for the use of either "LM 1458 N (NAT)" or "RC 1458 DA (RAY)". On February 14, 1975, Byer wrote a memo to Smith, Nank, Hoffman, and Harley Meadows at Magnovox in which he stated: "Warren warned us again to build only the Eaton design and specifications and to not make any arbitrary or unilateral revisions." Plaintiff's Exhibit 237.

On March 13, 1975, Williams (E) sent a then-current Eaton parts list to Hossman.[15] He asked Hossman to make whatever revisions were necessary in order that the list would accurately reflect Magnavox's use of components. On March 27, 1975, Hossman returned a "marked up" copy of this list to Williams. On the page of the list which included the op amps, Hossman drew a line through the National and Raytheon part numbers and wrote "615268 Mag."[16] In a letter attached to the list, Hossman stated that "Magnavox reserves the right to utilize parts and materials from sources in addition to those listed on the Eaton parts listing, provided they are equivalent to the listed vendor's product. In any case, where such substitutions are required Eaton will be notified prior to making the change." Plaintiff's Exhibit 53.

On April 1, 1975, Nank wrote to James Fahey of Eaton to convey the same message. He attached a copy of the parts list which Hossman had marked up, and he stated that Magnavox reserved the right to substitute equivalent parts. He also stated that Eaton would be notified prior to any such change.

On April 8, 1975, Hossman sent a second marked-up copy of Eaton's parts list to Williams. On this list, Hossman did not draw a line through the National and Raytheon part numbers. He did, however, add

---

15. This was the list that Eaton had prepared on January 24; it called for the National LM 1458N or the Raytheon RC 1458 DA.

16. This was a clerical error by Hossman, as 615268 was Magnavox's internal part number for the additional op amp used in the controllers. *See* n. 8 *supra.*

the Magnavox number 619937–101. On June 18, 1975, Eaton changed its parts list to reflect this change. For the first time, Eaton listed "619937–101 (MAG)" as its approved part number.[17]

On April 10 and 11, 1975, Williams (E) went to Magnavox to meet with Hossman and other Magnavox personnel. Williams wrote a memo to Krawczak (E) on April 17 to summarize his activities during this visit. He stated that he had received the parts list which was marked up by Magnavox, and added: "the part specifications covering the parts which we list by Magnavox part number were received." Plaintiff's Exhibit 55. Williams also stated that he would review these specifications and inform Hossman of any discrepancies. At trial, Williams testified that he did not receive Magnavox's 619937 drawing at this time.[18] Hossman could not recall whether this drawing was given to Williams during this visit.

On April 24, 1975, Fahey (E) responded to Hossman's letter of March 27. Fahey stated that no changes or substitutions were to be made to the Eaton parts list without written approval from Eaton.[19]

On July 29, 1975, Hossman wrote to Krawczak (E) regarding the alternate method of burning in the op amps which he had mentioned earlier. He stated that in order to evaluate this method, tests had been performed on "400 standard production RC4558DN units." Defendants' Exhibit I. The clear implication of the letter, however, was that Raytheon had performed these tests on *its* "standard production RC4558DN units." Hossman did not state that Magnavox was using these particular op amps in producing the controllers.

In fact, Magnavox *was* using the Raytheon 4558s in production. On August 11, 1975, Raytheon's director of marketing wrote to Magnavox. He informed them that Raytheon had discovered that some of its recently-manufactured 4558s were defective. He requested that Magnavox return all of its unused 4558s for replacement. Magnavox returned approximately 40,000 4558s to Raytheon pursuant to this request. Magnavox did not inform Eaton of this development, however.

In August, 1975, Eaton decided that Magnavox should use a second source for op amps, in addition to Raytheon. Eaton requested Magnavox to perform certain tests on the Fairchild 1458 op amp, to determine whether it would be an acceptable alternative.[20] After Magnavox performed these tests and obtained favorable results, Fahey (E) wrote to Byer on December 3, 1975 authorizing Magnavox to "add Fairchild 1458 quad-amps ... to your approved vendor list." Defendants' Exhibit K5. Fahey added: "These may be used along with or as an alternate to Raytheons presently in use." *Id.*

In November, 1975, Williams (E) began efforts to assemble a complete set of the Magnavox part drawings which were in use in the anti-lock program. He requested Magnavox to send him a 619937 drawing, among others. On December 4, 1975, Eaton received a complete set of the Magnavox drawings, including the 619937. Plaintiff's Exhibit 61I.[21] As discussed above, this drawing called for the use of Raytheon RC 4558DNs, among other parts. Williams testified at trial that he did not pay close

---

**17.** This part was still described as a "Dual 741 Op Amp, LM 1458 N (NAT)" on the Eaton parts list, however. Plaintiff's Exhibit 58.

**18.** It should be noted that at the time of Williams' visit, Eaton did not list the op amps by using a Magnavox number. Eaton, at that time, still listed the op amps by National and Raytheon numbers; Magnavox numbers were not used until June, 1975.

**19.** At trial, both Nank and Hossman testified that throughout the performance of the control-ler contract, they understood that Magnavox could not substitute any components without prior authorization from Eaton.

**20.** Magnavox had earlier removed Fairchild from its approved vendor list. Magnavox had found that the Fairchild op amps were prone to oscillation, and were difficult to solder.

**21.** Each of the drawings in this exhibit bears a date stamp which reads: "RECEIVED Dec. 4, 1975 Brake Division Product Engineering".

attention to these drawings when he received them, but merely forwarded them to Krawczak (E).

On March 23, 1976, Krawczak (E) sent Hossman (M) a document entitled "Magnavox Approved Sources Listing". This list included part number "619937(MAG)", which was described as a "Dual 741 Op-Amp LM1458". Defendants' Exhibit R8. The approved vendors for this part were Raytheon, National, and Fairchild.

This was apparently the last parts list prepared by either Eaton or Magnavox during Magnavox's production runs one through twenty-six. The last controllers which were manufactured during these runs were delivered to Eaton on April 30, 1976. Eaton had, by this time, purchased 42,947 controllers from Magnavox. The total purchase price Eaton paid for these controllers was $2,628,833.65.

On May 24, 1976, Fahey (E) wrote to Byer (M) regarding the transition to production run twenty-seven of the controllers.[22] Fahey stated that Eaton wanted to know if Magnavox or Sylvania had any surplus parts which would not be used in the run twenty-seven controllers. Fahey stated that Eaton had on hand "8,620 Raytheon RC 4558 Op-Amps that are burned-in", and asked Byer if Magnavox could use them. Defendants' Exhibit N5. Fahey later testified that he believed these were surplus parts given to Eaton by Sylvania.

By way of summary, the Court makes the following findings. Magnavox used three types of op amps in producing the controllers. These were the Raytheon RC

4558DN, the National LM 1458N, and the Fairchild 1458P1. The majority of the op amps used by Magnavox were Raytheon RC 4558DNs. Eaton informed Magnavox numerous times that the National 1458 was approved for use in the controllers. Moreover, Eaton expressly authorized Magnavox to use the Fairchild 1458, in a letter of December 3, 1975. Eaton never expressly authorized Magnavox to use the Raytheon 4558.

Eaton certainly knew that Magnavox was using Raytheon op amps. Eaton did not know, however, that Magnavox was using the RC 4558DN rather than the RC 1458DN. In several of its parts lists, Eaton had approved the use of Raytheon 1458s. Prior to receipt of Magnavox's 619937 drawing, Eaton had no indication that Magnavox was using the 4558 rather than the 1458.[23]

Once Eaton received the Magnavox 619937 drawing, it had notice that Magnavox considered the Raytheon 4558 and the National 1458 to be equivalent parts. Eaton received a copy of this drawing on December 4, 1975; there has been no showing that Eaton ever received a copy of this drawing before that date.[24] Yet even the notice provided by receipt of this drawing was ambiguous and somewhat contradictory. Hossman had earlier told Eaton that 619937–101 represented an "LM 1458N" which had been burned in. In addition, this drawing included other part numbers which had never been approved by Eaton and were never used in producing the controller.[25]

---

**22.** As mentioned above, there is no dispute in this action regarding the controllers produced after run twenty-six. These controllers included several changes in design and did not develop the problems discussed *infra.*

**23.** For two reasons, Eaton could not determine from a visual inspection of the controllers which op amps had been used. First, Magnavox received op amps which were imprinted with the Magnavox 619937–101 part number, rather than with the manufacturer's part number. Second, Eaton received the controllers in their "potted" form, after they had already been covered with epoxy and enclosed in a metal housing.

**24.** During discovery, Magnavox found in the Eaton files copies of the 619937 drawing which do not bear the "Dec 4 1975" date stamp. One reasonable inference is that Eaton therefore received copies of the drawing before that date. Yet this is not the only reasonable inference that can be drawn, and Magnavox was unable to establish that Eaton ever received the drawing before December 4, 1975.

**25.** For example, the Fairchild 1458P1 appeared on this drawing as early as February 6, 1974. Yet Magnavox did not use this op amp until Eaton approved its use on December 3, 1975. This suggests that Magnavox understood that any part included in its internal part drawings was not *ipso facto* approved for use by Eaton.

Finally, Eaton never expressly authorized Magnavox to use the Raytheon 4558s. In contrast, Eaton did expressly authorize the use of National 1458s, Fairchild 1458s, and the Raytheon 1458s which Magnavox never used. Moreover, it was the clear understanding of all of the parties that Magnavox could not substitute any other parts unless it had received Eaton's prior approval. Accordingly, it was improper for Magnavox to use Raytheon RC 4558 DNs in manufacturing the controllers.

## D. *Eaton's Discovery and Investigation of Defective Controllers*

Shortly after production of the controllers began, Eaton discovered that many of them contained faulty solder connections. On November 19, 1974, Medler wrote a report in which he stated that Eaton technicians had found many cracked solder joints in the controllers. In a meeting at Magnavox on December 5, 1974, the parties discussed the fact that faulty soldering had caused a number of controller failures.

On January 14, 1975, Hossman (M) wrote to Krawczak (E) regarding a controller which Eaton had returned to Magnavox. Hossman stated that this controller had many cracked solder joints, and that the leads from some of the components had broken. Hossman noted that the lead breakage occurred on those components that "stood up" when inserted in the printed circuit board. Hossman believed that the breakage was caused by the expansion and contraction of the "potting" material during the manufacturing process.[26]

On February 5, 1975, Eaton concluded that the most common cause of controller failures was cracked solder joints of large components. This conclusion was the result of tests which Eaton had performed on failed controllers; Eaton found that one of the components most often affected was a capacitor designated as "C 104" in the controller design.[27]

In March, 1975, Tom Gee of Eaton performed tests on "unpotted" controllers obtained from Magnavox.[28] Gee found that several of the solder joints were stressed and that some of them were broken. After reporting the results of his tests, Gee stated: "I have not developed any explanation of how these joints can fail without any potting." Plaintiff's Exhibit 73.

On March 13, 1975, Williams and Krawczak visited Magnavox, and observed the manufacturing process there. In a report of this visit, Williams expressed dissatisfaction with Magnavox's soldering techniques. He stated: "I informed Magnavox that it was of utmost importance that they cure their solder problems." Plaintiff's Exhibit 71.

In May, 1975, Hossman (M) discovered one source of these solder problems. C 104 was located at the very edge of the printed circuit board.[29] Hossman found that in order to fit the controller into its housing, Magnavox employees were manually pushing this large component towards the center of the board. Hossman found that the resulting stress on the C 104 solder joints could cause them to break. Although Magnavox had already shipped to Eaton approximately 22,000 controllers which had

Otherwise, Eaton's approval of the Fairchild op amp would have been superfluous; Eaton had already approved "619937–101 (MAG)" as early as June, 1975. See n. 18 *supra.*

26. This was the epoxy material in which the controller was encased. The parties found that the use of this potting material, in connection with the single-sided circuit board used, caused stress to many of the components. Eaton specified the potting material to be used. Eaton also approved the use of a single-sided circuit board, rather than a more durable double-sided board. This approval, however, was a result of Magnavox's recommendation and clear preference for the use of single-sided boards. In addition,

Magnavox had performed tests using these materials before production began.

27. C 104 is one of the largest components in the controller, and it "stands up" when inserted in the printed circuit board.

28. Controllers are "potted" once they are enclosed in epoxy and their metal housing. An "unpotted" controller is a printed circuit board which has not yet been subjected to this process.

29. Magnavox had earlier designed the physical arrangement of the components on the printed circuit board. See n. 6 *supra.*

been manufactured in this way, Hossman did not inform Eaton of his discovery.

In September, 1975, Eaton received three controllers as a return from one of its customers. Eaton found that each of these had a broken solder joint at C 104, and it sent two of them to Magnavox for further analysis. At a meeting at Magnavox on September 15, 1975, Eaton officials again informed Magnavox that some of its customers had experienced problems with the controllers that were caused by cracked solder joints at C 104.

On September 22, 1975, Byer wrote an internal memorandum to Smith, Hoffman, Hossman, Meadows, and three other Magnavox employees. He directed that Magnavox should resolder certain components, including C 104, which required "particular care in assembly." Plaintiff's Exhibit 84. Byer added: "These are the components which have exhibited repeated solder joint fracture. This is our problem, and we will have to absorb the cost." *Id.*

Hossman (M) wrote to Krawczak (E) on September 26, 1975 regarding the two controllers which Eaton had sent to Magnavox for analysis. For the first time, he informed Eaton of the manufacturing problems which he had discovered in May. He described the movement of C 104 during the potting process and added: "This movement exerted a large force on the solder joint at the negative lead and could lead to intermittent connections." Plaintiff's Exhibit 82. Hossman stated that Magnavox had taken corrective action in May to eliminate this problem.

On September 30, 1975, Krawczak wrote a memo to other Eaton officials to convey the contents of Hossman's report. Krawczak stated that the controllers manufactured prior to May, 1975 could be expected to exhibit unusually frequent C 104 failures. Krawczak believed at that time that the C 104 failures would generally be detected by the "supertester", a device which tested all of the electrical functions

in the controller at the end of the manufacturing process. This belief proved to be incorrect. The problem caused by the solder failures was intermittent; even a controller which passed the "supertester" could malfunction at a later time.

Eaton continued to receive returns of controllers from its customers. In some instances, customers complained that the controller had failed to function, yet the warning light had not been activated. Eaton evaluated these returned units in order to determine the cause of the failures, and found that faulty solder connections at C 104 were a common cause.

Eaton then began a major investigation into the causes of the controller failures. The head of this investigation was David Klien, who was a senior project engineer at the Eaton Research Center. Klien conducted a series of tests on controllers which had been returned to Eaton by its customers.

Klien's tests involved primarily the performance of the controllers' failsafe functions. As designed by Eaton, the controller had two different failsafe functions. The short-term failsafe occurred when the controller detected abnormal conditions which were external to the controller. The long-term failsafe occurred when the controller detected abnormal conditions within the controller itself. In either instance, the anti-lock system was designed to disable itself. At the same time, the warning light in the vehicle's dashboard was to be activated, and the affected axle was to be returned to manual, non-regulated braking. The short-term failsafe was to occur within one second of the onset of the abnormal conditions; the long-term failsafe was to occur within eight to ten seconds.

In performing tests on the failed controllers, Klien found that when C 104 was "open",[30] the controller would develop an abnormal condition called a "constant solenoid".[31] Although the controller was designed to failsafe when this condition oc-

---

**30.** This occurred when the solder connection had failed or the capacitor's lead had broken. In either event, the controller would experience an open circuit at this location.

**31.** This condition was an erroneous and continuous activation of the solenoid connected to the controller.

curred, Klien found that some of the returned controllers did not. These controllers either failsafed only after an extended period of time, or did not failsafe at all. When the controller did not failsafe, this meant that the controller was not operating, yet the axle had not been returned to manual braking. As a result, the vehicle would have no brakes whatsoever on the affected axle.

Klien then discovered that many of the controllers contained Raytheon RC 4558DN op amps rather than National LM 1458Ns. After performing further tests, he found that this substitution had a significant effect on the performance of the controllers. He found that when a controller contained op amps with an NPN input bias current, such as the National 1458, an open C 104 would cause the unit to failsafe in less than one second. When that occurred, the warning light would activate and the axle would be returned to manual braking. He found that when a controller contained op amps with a PNP input bias current, like the Raytheon 4558, it performed quite differently. In that event, the controller would produce an abnormal signal which was sufficient to cause the "constant solenoid" but was often insufficient to activate the failsafe function.

Klien found that 74% of the controllers containing PNP input op amps would experience a "normal" long-term failsafe and disable the anti-lock system in six to twelve seconds. He found that 6% of these controllers experienced an "extended" long-term failsafe, disabling the anti-lock system within fifteen seconds to one minute after the onset of the constant solenoid. Klien found that the remaining 20% of these controllers did not failsafe at all. As described above, this meant that there would be no brakes on the affected axle.

Klien reported the results of his tests in a memorandum to Robert Sokalski of Eaton on July 14, 1977. After further analysis of the problem, Eaton found that it could not identify which of the controllers

manufactured by Magnavox contained op amps with a PNP input bias current. Moreover, Eaton found that it could not predict which of these op amps would experience the "normal" long-term failsafe and which would not. Eaton then attempted to develop a means of repairing the controllers which had already been installed in vehicles, in order to eliminate this problem. Eaton found that there was no practicable method of performing such repairs.

Fahey (E) called Byer (M) on January 25, 1978. Fahey expressed his understanding that Magnavox's warranty was to be "indefinitely extended if the vendor installs the wrong parts which results in deficient performance." Plaintiff's Exhibit 87C. Byer responded to this call in a letter of February 3, 1978. He disagreed with Fahey's understanding of the warranty terms, but added: "Magnavox's responsibility with respect to use of incorrect or unapproved parts is also covered in the original warranty under 'non-conformance'." *Id.*

In March, 1978, Eaton informed all of its customers of the failsafe malfunctions it had discovered in the controllers. By this time, Eaton knew of at least thirty-five verified occurrences in which a customer's brakes had failed in the manner described above.

On March 6, 1978, John Rodewig of Eaton wrote to Smith (M) to revoke Eaton's acceptance of all controllers which Magnavox had manufactured in runs twenty-six and earlier. Rodewig contended in his letter that Magnavox had used non-specified op amps in manufacturing the controllers, and that this constituted a latent defect in the controllers. Rodewig and Smith met to discuss the problem on March 20, 1978. On March 23, Smith wrote to Rodewig. He contended that Magnavox was not responsible for the alleged defects in the controllers. He stated: "[O]nly approved parts, including the one in question, were installed in Eaton controllers." Plaintiff's Exhibit 93.[32]

---

**32.** After Eaton filed this complaint, Magnavox performed tests to determine the effect of an open C 104 in the controller. Magnavox used op amps with both PNP and NPN input bias currents in performing these tests. Magnavox found that when C 104 was open, the controllers could malfunction regardless of whether the op

### E. *Eaton's Recall of the Controllers*

On March 29, 1978, a representative of Mack Trucks wrote to NHTSA to inform the agency that it was recalling many of its trucks in order to replace the controllers which it had purchased from Eaton. This letter stated that the "constant solenoid" condition had caused brake failures in twenty of Mack's trucks, and that the potential threat to safety had caused Mack to institute this recall.

On March 30, 1978, Miles Tuttle of Eaton wrote to Mack Trucks, offering to provide replacement controllers and reimburse Mack for reasonable replacement and administrative costs. On April 7, 1978, NHTSA sent a telegram to Rodewig. The agency informed Eaton of the letter it had received from Mack Trucks. The agency asked Eaton to supply its analysis of the defect in the controllers, and a list of the OEMs who had purchased these controllers.

On April 11 and 14, 1978, Tuttle responded to this telegram. He informed NHTSA of the problem, explained Eaton's analysis of the problem, and listed the OEMs who had purchased the controllers. On June 30, 1978, NHTSA issued a Consumer Advisory announcing the recall of all of the controllers which Magnavox had manufactured for Eaton in runs one through twenty-six.

Because Eaton had reasonably concluded that the controllers could not be repaired,[33] Eaton then arranged to replace all of the controllers which were being recalled. Tuttle found that Eaton had shipped 42,947 of the defective controllers to its customers. He then spoke to representatives of the OEMs who had participated in similar recalls. He found that Eaton could expect approximately sixty-five percent of its customers to respond to the recall notices and request replacement controllers. Accordingly, he concluded that Eaton would not need to order 42,947 replacement controllers in order to fulfill the demands of the recall program.

Eaton purchased controllers from Magnavox for use in the recall program. These controllers were of the run twenty-seven design. *See* n. 22 *supra.* In addition, they were supplied by Magnavox in their unpotted form. While Magnavox had sealed the original controllers in their housings, Eaton performed this function for the replacement controllers.

Eaton then made arrangements with its customers to replace the defective controllers. Eaton shipped the new controllers to

---

amps used had a PNP or an NPN input bias current.

For four reasons, however, the Court cannot grant much weight to the results of these tests. First, Magnavox used controllers manufactured in run twenty-seven in performing these tests. These controllers were of a different design from those which are the subject of this lawsuit. William Hayes testified that Magnavox removed two components from these controllers in order to simulate the run twenty-six design. The notes of the Magnavox employee who performed the tests, however, indicate that only one of these components was removed.

Second, Magnavox modified other components in the controllers prior to performing the tests. The effect of these other changes was not satisfactorily explained.

Third, after the tests had been concluded and C 104 was properly re-installed, Magnavox found that one of the controllers used still did not perform correctly. This implies that there were other irregularities in the controller, and it further casts in doubt the validity of the results.

Fourth, Hayes testified that Magnavox had also performed similar tests before Eaton filed its complaint. In these earlier tests, Magnavox had found that controllers containing op amps with NPN input bias current *would* failsafe correctly, a result inconsistent with the tests performed after the institution of the lawsuit.

**33.** Magnavox has argued that Eaton acted unreasonably in recalling the controllers because the controllers could have been repaired. This argument is based on a proposal made by Magnavox on January 13, 1975 in which it offered to repair certain controllers at a cost of $10.40 each.

Hoffman testified, however, that this repair technique could not have been performed in the field. In order to perform this repair, all of the controllers would have to be shipped to Magnavox. In addition, a replacement controller would have to be shipped to the OEM, so that the anti-lock system would be operative while Magnavox performed the repairs. Finally, it was not established that this repair technique would have successfully alleviated the "constant solenoid" problem. The Court finds that there was no practicable method of repairing the controllers, and that Eaton acted reasonably in replacing them.

its customers. Eaton employees performed some of the labor required to replace the defective controllers; employees of the OEMs performed some of this work as well. Once the replacement controllers were installed, the defective controllers were returned to Eaton.[34] Eaton did not return these defective controllers to Magnavox, but rather stored them in an Eaton warehouse. Eaton considered these defective controllers to be worthless, and did not attempt to repair them.

Eaton devised an accounting method which it used to determine its costs in executing the recall program. As costs of the program, Eaton included the cost of purchasing and manufacturing the replacement controllers, the reasonable administrative costs which were charged to Eaton by its customers,[35] the cost of paying Eaton employees to investigate the problem and assist its customers in replacing the controllers, and other freight and handling expenses.

Eaton's calculation of its total recall costs is comprised of three figures. The first is Eaton's cost of obtaining the replacement controllers which were used during the recall program and the administrative costs of the program. Eaton actually used only 7260 replacement controllers to replace the defective controllers. The cost of these controllers was $336,070.35. In November, 1980, Eaton disposed of 5,250 replacement controllers which it had obtained from Magnavox. These controllers had not yet been used in the recall program, and Eaton concluded that they would not be required. The cost of these controllers was $236,551.86.[36] Adding the other costs of administering the recall program,

Eaton found that its costs for executing the recall were $1,023,615.18.

The second cost calculated by Eaton was the value of the 5,612 replacement controllers that were not used in the recall campaign and were still in Eaton's inventory when the recall program ended in 1982.[37] Using the October, 1979 cost figures, Eaton found that the cost of these controllers was $261,853.10.

The third cost calculated by Eaton was the cost of investigating the problem in the controllers. This consisted of the salaries paid to Eaton employees during the time they worked on this project. Eaton calculated that this cost was $117,445.00.

Adding these three figures together, Eaton found that the total cost of the recall program was $1,402,913.28. Magnavox has not challenged the accuracy of any of these figures.

## II. CONCLUSIONS OF LAW

### A. *Breach of Contract*

Eaton claims that once it learned of the problems which had developed in the controllers, it revoked its acceptance of all of the controllers manufactured by Magnavox in production runs one through twenty-six. Complaint at ¶ 33. Eaton further claims that it is entitled to recover damages as a result of its revocation. The Court finds that Eaton's attempt at revocation was ineffective, and that it cannot recover damages under this theory.

Eaton attempted to revoke its acceptance of the controllers on March 6, 1978, when Rodewig wrote to Smith. This occurred nearly two years after the last of these controllers was delivered to Eaton. Al-

---

**34.** In some instances, Eaton accounted for the replacement of defective controllers without actually receiving the defective controllers in return. Usually, however, Eaton actually received in return the defective controller which had been replaced.

**35.** Eaton did not include as a cost of the recall any of its own administrative expenses.

**36.** To calculate this cost, Eaton used cost figures which were current as of October 3, 1979. This

may have been more than Eaton paid for the replacement controllers in 1978.

**37.** Eaton purchased a total of only 18,122 replacement controllers. If Eaton expected to replace sixty-five percent of the controllers during the recall program, this would have required 27,916 replacements. Neither this discrepancy nor the extremely low response to the recall program has been explained by Eaton.

though the mere passage of time did not prevent Eaton from revoking its acceptance, the intervening events which occurred during this time did preclude Eaton from making an effective revocation of its earlier acceptance.

Under the Uniform Commercial Code ("U.C.C."),[38] six elements are required to establish an effective revocation. The buyer must establish that:

1. The nonconformity in the goods substantially impairs their value;

2. His acceptance of the goods was caused by his reasonable assumption that the nonconformity would be cured, the difficulty of discovering the nonconformity, or the seller's assurances;

3. The revocation occurred within a reasonable time after the buyer discovered or should have discovered the ground for it;

4. The revocation occurred before any substantial change in the condition of the goods which was not caused by their own defects;

5. He has given notice to the seller; and

6. If he has taken physical possession of the goods, he has held them with reasonable care for a sufficient period of time to permit the seller to remove them.

Mich.Comp.Laws Ann. §§ 440.2602, 440.-2608; *see generally* J. White and R. Summers, *Uniform Commercial Code* at § 8–3 (2d ed. 1980).

■ Without addressing the other four elements, the Court finds that Eaton failed to establish two of these elements. First, Eaton attempted to revoke its acceptance only after there had been a substantial change in the condition of the controllers. In *United States v. Crawford*, 443 F.2d 611 (5th Cir.1971), the court interpreted Georgia's enactment of the U.C.C., which is identical in this respect to Michigan's enactment. In that case, defendant had purchased a number of fuel filter separation units for installation at a U.S. Naval Air Station. After defendant installed the units at the Air Station, the seller brought an action for the unpaid portion of the purchase price. The court held that defendant had accepted the goods as a matter of law, and could not avoid payment on the ground that he had revoked his acceptance. The court stated:

A buyer who has accepted goods may under certain conditions revoke his acceptance. Georgia UCC § 2–608. However, once Crawford had accepted and installed the units supplied in place on the Albany site, any subsequent attempt at revocation was ineffective.

443 F.2d at 613. *Accord, Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp. 666 (N.D.Ga.1982). In the case at bar, Eaton first sought to revoke its acceptance of the controllers only after the controllers had been sold by Eaton to its customers, had been installed in trucks throughout the country, and had been used by the OEMs for extended periods of time. The sale, installation, and use of the controllers constituted a "substantial change in condition of the goods" which was not caused by any defect in the controllers, and it therefore precluded Eaton from subsequently revoking its acceptance. Mich.Comp.Laws Ann. § 440.2608(2).

■ Second, Eaton did not and could not hold the controllers in order for Magnavox to remove them. Under Mich.Comp.Laws Ann. § 440.2608(3), a buyer who revokes his acceptance "has the same rights and duties with regard to the goods involved as if he had rejected them." These duties are set forth, in part, in Mich.Comp.Laws Ann. § 440.2602(2)(b). Under this section, a buyer who has taken physical possession of the goods has a duty after revocation to hold the goods for a reasonable time in order to allow the seller to remove them. *See*

---

**38.** Under the Code, the parties to a contract have the power to exclude the effect of the Code by agreement. Mich.Comp. Laws Ann. § 440.-1102(3). The only provision of the parties' agreement which relates to the subject of revocation states: "Buyer's acceptance of goods will be considered to be final except as to latent defects, fraud or gross mistakes amounting to fraud." The parties did not agree to waive any of the conditions required under the Code for an effective revocation.

White and Summers, *supra,* at 316. In the case at bar, Eaton attempted to revoke its acceptance of 42,947 controllers, despite the fact that only 7260 of the controllers were returned to Eaton by its customers. Assuming *arguendo* that Eaton fulfilled its duty with respect to the 7260 controllers which were returned by its customers,[39] it is clear that Eaton did not hold for Magnavox the remaining 35,687 controllers which were in the possession of its customers. It would have been impossible for Eaton to do so, because these controllers were not within Eaton's possession or control.[40]

In sum, Eaton sought to revoke its acceptance of the controllers only after the controllers had undergone a substantial change in condition, and Eaton did not hold for Magnavox the controllers which it had allegedly revoked. Eaton's attempted revocation was therefore ineffective, and its claims in Count I must fail.

### B. *Breach of Express Warranty*

■ Eaton claims that Magnavox breached an express warranty it issued in connection with the manufacture of the controllers. Eaton further claims that the recall of the controllers was necessitated by the breach of warranty, and it seeks to recover its damages. The court finds that Eaton is barred from recovering any damages under this theory; although Magnavox did breach its express warranty, Eaton failed to supply Magnavox with timely notice of the breach as required by Mich. Comp.Laws Ann. §§ 440.2607 and 440.2714.

Magnavox issued two express warranties in its agreement with Eaton. First, Magnavox warranted against defects in workmanship and materials for a period of twelve months after delivery.[41] Second, by agreeing to "indemnify Eaton against nonconformances to specifications", Magnavox warranted that the controllers would conform to the specifications issued by Eaton.

Magnavox breached the second warranty by using the Raytheon 4558 op amps in manufacturing the controllers. As noted above, Eaton issued several parts lists as part of the specifications for the controllers. These parts lists repeatedly called for the use of the National LM 1458N. The only other op amps which were approved by Eaton were the Raytheon RC 1458DN and the Fairchild 1458P1. Eaton never expressly authorized the use of the Raytheon RC 4558DN. Eaton did approve the use of Magnavox's part number 619937, but the Court cannot regard this as approval of the use of the Raytheon 4558s. Magnavox had earlier informed Eaton that 619937 designated a burned-in LM 1458N, so the receipt of the 619937 drawing provided ambiguous notice as to the other part numbers contained therein. Moreover, even this ambiguous notice was not received by Eaton until December 1975, shortly before Magnavox completed manufacturing the controllers in runs one through twenty-six.

Magnavox argues that Eaton waived any breach of this warranty by accepting prototype and pre-production controllers containing the 4558s without notifying Magnavox that the use of 4558s was improper.[42] Even if Eaton was or should have been aware that these controllers contained 4558s, however, its failure to complain was not a waiver of the breach of warranty. The prototypes and pre-production controllers contained both National 1458s and Raytheon 4558s. They were produced and shipped to Eaton during a period of time in which there were a number of design changes in the controllers; they were not regarded by either party as a definitive model of the controllers. The shipment

---

**39.** Eaton received the majority of the controllers which were replaced during the recall campaign. Some of the defective controllers, however, were accounted for without being physically returned to Eaton. *See* n. 34, *supra.*

**40.** Even as to the 7260 controllers which Eaton arguably did hold for Magnavox, its attempt at revocation was ineffective. This is because these controllers had been installed in trucks and used extensively prior to Eaton's attempted revocation. *Crawford, supra.*

**41.** This warranty period was later extended to fifteen months after delivery.

**42.** The prototype and pre-production controllers were shipped to Eaton in their unpotted form. A visual inspection, Magnavox argues, would have disclosed the use of Raytheon 4558s.

and receipt of these controllers is, at best, ambiguous evidence of Magnavox's intent to use 4558s in producing the production controllers. Eaton's parts lists, on the other hand, were wholly unambiguous. Every parts list issued by Eaton called for the National 1458; none called for the Raytheon 4558. In sum, Magnavox breached its express warranty in using the Raytheon 4558s, and Eaton never waived its rights to recover for this breach.

Eaton claims that Magnavox also breached its warranty against defects in workmanship by supplying controllers with defective solder joints. This warranty, however, lasted for only twelve to fifteen months after delivery of the controllers. As the last controller manufactured during runs one through twenty-six was delivered to Eaton in April, 1976, Magnavox's liability on this warranty had completely terminated by July, 1977. Magnavox cannot rely on defective solder connections alone to justify the subsequent recall of all of the controllers; as discussed below, the recall was necessitated by the combination of these faulty solder connections with Magnavox's use of the 4558s. Moreover, Eaton made no attempt to establish that *any* of the particular controllers recalled had experienced solder failures within the fifteen months following shipment. Accordingly, Eaton failed to establish that Magnavox's faulty solder connections, standing alone, constituted a breach of express warranty justifying a recall of all of the controllers produced.

Even though Magnavox's use of the Raytheon 4558s was a breach of warranty, Eaton must establish other elements under the U.C.C. in order to recover damages for the breach. Under Mich.Comp.Laws Ann. § 440.2714, a buyer can recover damages for breach of warranty only if he has accepted the goods and given the notice required under Mich.Comp.Laws Ann. § 440.-2607(3)(a). Under the latter section, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." The buyer must provide reasonable notice in order to recover for a breach of warranty. *Steel &*

*Wire Corp. v. Thyssen, Inc.*, 20 U.C.C.Rep. 892 (E.D.Mich.1976). Moreover, what constitutes a "reasonable time" is to be determined under the facts of each case. Mich. Comp.Laws Ann. § 440.1204(2).

Eaton argues that it had repeatedly notified Magnavox that many of the controllers had faulty solder connections, and relies on this as adequate notice of the controllers' defects. Yet the "defect" which led to the recall was not the mere presence of solder failures in some of the controllers. Eaton knew of many such solder failures, but never considered this defect of sufficient magnitude to require a recall of all of the controllers until it discovered that Magnavox had used 4558s in manufacturing the controllers. Prior to this discovery, Eaton's practice upon receiving controllers with faulty solder connections was to return the controllers to Magnavox for repair or replacement. After Eaton learned that Magnavox had used 4558s, on the other hand, Rodewig (E) informed Smith (M) on March 6, 1978 that this non-conformance was sufficiently serious that Eaton was revoking its acceptance of all of the controllers. Eaton plainly still did not regard the solder failures as a serious problem, as Rodewig informed Smith in his letter that the controllers "as designed"—i.e. with National 1458s—would function properly even when C 104 failed. Magnavox's use of the 4558s, therefore, was the most important factor in the breach of warranty. Eaton never informed Magnavox that its use of 4558s was considered a breach of warranty until Rodewig's letter of March 6, 1978.

Eaton claims that it was not required to notify Magnavox that the controllers contained 4558s, because Magnavox was already aware of this. This argument misses the point of the notice requirement in Mich.Comp.Laws Ann. § 440.2607, however. Eaton was required to inform Magnavox not only that the controllers contained 4558s, but also that Eaton considered this to be a breach of warranty. Magnavox never received notice to this effect until Smith received Rodewig's letter

which impliedly stated that the use of 4558s was a breach of warranty.[43]

Eaton further argues that Magnavox should be estopped to claim that Eaton's notice was untimely, because Magnavox had led Eaton to believe that it was using the National 1458s in manufacturing the controllers. Even if this argument is accepted, however, Eaton undisputedly knew by July 14, 1977 that Magnavox had used 4558s in the controllers and that this caused problems. After having completed his investigation, Klien issued an internal Eaton memorandum on that date which stated:

> [T]he Raytheon devices specified and used by Magnavox are not true 1458 devices even though the other five source's amplifiers, specified by Magnavox on their drawing number 619937, are 1458 type amplifiers.
>
> The device number specified by Magnavox for Raytheon is the RC4558DN which is an operational amplifier with specifications similar to the RC1458DN which Raytheon also produces. The major difference between these two devices is that the 1458 amplifiers use NPN input transistors while the 4558 devices use PNP input transistors. This difference *totally explains* the breakdown voltages depicted in WFM7 and WFM8. (Emphasis supplied.)

Plaintiff's Exhibit 90A. Eaton therefore knew that the controllers contained 4558s; Eaton had long known that some of the controllers had faulty solder connections. Klien's discovery was the precise basis for Eaton's later claim that the use of 4558s constituted a nonconformity to Eaton's specifications, yet Eaton waited nearly eight months before notifying Magnavox that its use of 4558s was considered improper.

Eaton has offered no justification for this eight-month delay in providing notice to Magnavox, except for its claims that it was trying to "bracket" the population of controllers containing 4558s, to evaluate possible methods of repair, and to discuss the situation with its customers. Yet Eaton knew by July, 1977 *exactly* what was causing the controller failures. While Eaton's activities after that date may have been "reasonable", they did not obviate Eaton's duty under the U.C.C. to notify Magnavox of the problem. Rather than notifying Magnavox of the problem, however, Eaton attempted to obtain Magnavox's unwitting agreement to extend the controllers' warranty period. As noted above, Fahey called Byer on January 25, 1978 seeking confirmation of his "understanding" that Magnavox's warranty was to be indefinitely extended if Magnavox installed the "wrong parts."

■ One of the policies behind the notice requirement in Mich.Comp.Laws Ann. § 440.2607 is to afford the seller an opportunity to prepare for negotiation and litigation. *Thyssen, supra;* White and Summers, *supra,* at 422. Eaton's attempt to extend the warranty period before giving notice of a known defect was inconsistent with that policy, and is evidence of Eaton's bad faith in attempting to resolve the disputes arising under the parties' agreement. Although no prejudice to Magnavox was shown in connection with Eaton's delay in providing notice, this is not required for a finding that the notice was untimely. *Ashley v. Goodyear Tire & Rubber Co.,* 635 F.2d 571 (6th Cir.1980) (applying Michigan law).

Under the circumstances, the Court finds that Eaton did not notify Magnavox of the controllers' defects within a reasonable time after their discovery. Under Mich. Comp.Laws Ann. § 440.2607(3)(a), Eaton accordingly cannot recover any damages for Magnavox's breach of its express warranty.

---

**43.** Eaton correctly argues that the notice required under § 440.2607 may be quite informal. *See* White and Summers, *supra,* at 425. The official comments to § 2-607 note that: "The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." Prior to March, 1978, Magnavox had never been informed that the use of 4558s in the controllers was "claimed to involve a breach."

## C. *Breach of Implied Warranties*

■ Eaton claims that Magnavox breached an implied warranty of merchantability, in that some of the controllers did not function properly. Eaton further claims that Magnavox breached an implied warranty of fitness for a particular purpose, by using the Raytheon op amps. Complaint at ¶ 50. Eaton claims that its recall expenses were caused by these breaches, and it seeks to recover these expenses. The Court finds that Eaton's failure to provide timely notice bars any recovery under this theory as well.

Every sales contract governed by the U.C.C. includes an implied warranty of merchantability, unless it is effectively disclaimed. Mich.Comp.Laws Ann. § 440.-2314. Where, as in the case at bar, the seller knows the particular purpose for which the goods are required and also knows that the buyer is relying on the seller's skill and judgment, an implied warranty that the goods are fit for such purpose is also created unless effectively disclaimed. Mich.Comp.Laws Ann. § 440.-2315.

■ Magnavox did not effectively disclaim these warranties. Under Mich.Comp. Laws Ann. § 440.2316(2), such a disclaimer must meet the following requirements:

[T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.

Magnavox's attempted disclaimer of these warranties stated merely:

Delete pending final negotiations on specifications, acceptance test results and MTBF. It is our present intent to warrant against defects in workmanship and material for a period of twelve months after delivery and to indemnify Eaton against non-conformances to specifications but in no instance will Magnavox accept responsibility for consequential damages.

The attempted disclaimer did not "mention merchantability", nor was any part of its language conspicuous. It was therefore ineffective.

■ Magnavox contends that these implied warranties were deleted by agreement of the parties, even though they were not expressly disclaimed. This argument ignores the clear requirements of Mich. Comp.Laws Ann. § 440.2316(2), however, and is unsupported by any authority.[44] Magnavox further argues that these warranties were excluded by Eaton's failure to object to the use of RC 4558 DNs after inspecting the prototype controllers, and by the parties' course of dealing. *See* Mich. Comp.Laws Ann. § 440.2316(3)(b), (c). As for the former contention, the Court noted above that these prototypes were not regarded by either party as a definitive model of the production controllers; Eaton's inspection of the prototypes therefore did not negate the implied warranties. As for the latter, Magnavox's conclusory argument does not point to any particular part of the parties' course of dealing which would act to exclude the implied warranties.

■ Eaton claims that the substitution of op amps and the faulty solder connections which constituted a breach of express warranty also constituted a breach of implied warranties. Assuming *arguendo* that Eaton's argument should be accepted, however,[45] Eaton is barred from recovering

**44.** Magnavox relies upon *Office Supply Co., Inc. v. Basic/Four Corp.*, 538 F.Supp. 776 (E.D.Wis. 1982) in arguing that it disclaimed any implied warranties. The parties' agreement in that case stated: "The warranties contained in this Agreement are in lieu of all other warranties, express or implied, *including any regarding merchantability or fitness for a particular purpose ...*". *Id.* at 779 (emphasis added). This is in clear contrast to the language employed by Magnavox in its attempted disclaimer.

**45.** Magnavox argues that no implied warranty of merchantability could attach to the controllers, because they were a "new and essentially untested" product. Magnavox's post-trial brief at 17. Magnavox further argues that no implied warranty of fitness for a particular purpose could attach because Magnavox merely built the controllers in accordance with Eaton's specifications. Eaton, of course, has attempted to refute both arguments. Because the Court finds that

any damages by its failure to provide timely notice of the breach.

As in the case of a breach of express warranty, a buyer who seeks to recover damages for a breach of implied warranty must provide notice to the seller "within a reasonable time after he discovers or should have discovered any breach ... or be barred from any remedy." Mich.Comp. Laws Ann. § 440.2607(3)(a); *see also* Mich. Comp.Laws Ann. § 440.2714; White and Summers, *supra*, at 343–344. Eaton again argues that it provided frequent and early notice that many of the controllers had faulty solder connections, and that this was sufficient notice of the controllers' defects. As noted above, however, the breach of warranty claimed by Eaton consisted of these faulty connections *in connection with* Magnavox's use of RC 4558 DNs.[46] Although Eaton knew by July 14, 1977 that Magnavox had used RC 4558 DNs in manufacturing the controllers, it did not notify Magnavox until March 6, 1978 that the use of these op amps was considered to be improper. In the interim, Eaton attempted unsuccessfully to extend the warranty period created by Magnavox's express warranty. For the reasons noted above, this delay was unreasonable. Eaton accordingly cannot recover damages for the breach of implied warranties which it has alleged.

### D. *Misrepresentation*

Eaton's complaint includes two allegations of misrepresentation by Magnavox. Eaton alleges that Magnavox represented that it was expert in electrical componentry, and that it was using the parts specified by Eaton in manufacturing the controllers. Complaint at ¶¶ 55, 58. Eaton claims that these representations were false, and that it relied on them to its detriment. In its post-trial submissions, Eaton has abandoned the first claim, but has made a similar claim that Magnavox misrepresented that it was capable of making good solder connections in the controllers. In addition, Eaton now claims that Magnavox committed an additional misrepresentation in failing to inform Eaton of its May, 1975 discovery that the C 104 solder joints were being stressed during assembly.

 Two different causes of action for misrepresentation are now recognized in Michigan. To establish fraudulent misrepresentation, Eaton must prove:

(1) That defendant made a material misrepresentation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Hi-Way Motor Co., v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813 (1976). Eaton has produced no evidence whatsoever that Magnavox made any of the alleged misrepresentations intentionally in hopes of misleading Eaton, and Eaton tacitly concedes that it cannot establish fraudulent misrepresentation. The Court finds that Magnavox clearly did not make any fraudulent misrepresentations.

In the alternative, Eaton contends that Magnavox is liable under the theory of innocent misrepresentation. This basis for liability was recognized by the Michigan Supreme Court in *United States Fidelity & Guaranty Co. v. Black*, 412 Mich. 99, 313 N.W.2d 77 (1981). Plaintiff in *Black* had issued bonds guaranteeing to pay for labor and materials used in a construction project if the contractor failed to do so.

---

Eaton's notice was untimely in any event, it need not resolve these disputes.

**46.** Eaton alleged in its complaint as follows: 50. The Magnavox controllers for the Eaton Model 21 Anti-Lock System for trucks *with the Raytheon operational amplifiers used at the two locations* ... were not fit for the particular purpose for which they were used.

(Emphasis added). Furthermore, Eaton notes in its post-trial brief:

Although Magnavox tries to separate the substitution of the op amps from the open C–104 solder problem, these cannot be separated. *Both conditions have to be present in order to have a failure of the failsafe. Without one or the other, no recall would have been necessary.* *Id.* at 5 (emphasis added).

Defendants, in turn, had agreed to indemnify plaintiff against any losses incurred in connection with the bonds. Defendants agreed orally to sign the indemnity agreement only after being assured that plaintiff had obtained similar indemnity agreements from several other parties, and that plaintiff would enforce all of these other agreements before looking to defendant for any payments. Plaintiff's agents informed defendants that these conditions were a part of the agreement and that plaintiff had executed the other indemnity agreements; several months later, defendants executed their indemnity agreement. After plaintiff suffered losses on the bonds it had issued, it brought suit against defendants on the indemnity agreement. Defendants then learned, for the first time, that plaintiff had *not* obtained similar indemnity agreements from other parties as it had represented.

■ Defendants argued that the plaintiff's misrepresentations relieved them from liability on the indemnity agreement. In reversing the Court of Appeals, the court held that defendants might be able to establish the defense of innocent misrepresentation on these facts.[47] As recognized by the court in *Black*, the tort of innocent misrepresentation includes six elements:

 1. A material representation by defendant;

 2. Falsity of the representation;

 3. The representation is made "in connection with making a contract";

 4. Reliance by the plaintiff;

 5. Resulting injury to the plaintiff; and

 6. The injury must inure to the benefit of the defendant.

*Id.* at 117–8, 313 N.W.2d 77.

The court expanded on its holding that the representation must be made "in connection with making a contract". The court stated:

Whenever a party engages in contractual negotiations that party attempts to persuade the other to accept the proposed terms, and vice-versa. The parties reach the goal of forming a mutually agreeable contract based upon the representations made in the course of bargaining.

 \* \* \* \* \* \*

Therefore we hold that independent proof of intent to induce reliance is unnecessary to maintain an action in deceit under the doctrine of innocent misrepresentation inasmuch as a material statement made in the course of contractual negotiations is presumptively made with the intention that it should be relied upon.

*Id.* at 119–20, 313 N.W.2d 77.

Accordingly, the court recognized a cause of action for innocent misrepresentation only in connection with statements "made in the course of contractual negotiations". The statements of plaintiff's agent in *Black* to the effect that plaintiff had entered into indemnity agreements with a number of other persons clearly satisfied this requirement. These statements were made several months before defendants executed their indemnity agreement, and defendants indicated that they would not execute their agreement unless plaintiff entered into these other agreements as well. The statements were made in order to induce defendants to enter a contract, and the defendants did enter into a contract in reliance on the statements.

■ Just as clearly, none of the misrepresentations alleged by Eaton occurred "in the course of contractual negotiations". Eaton and Magnavox executed their contract on March 1, 1974. Eaton has neither alleged nor established any representation by Magnavox prior to that date to the effect that Magnavox could make good solder connections in the controllers. Similarly, Magnavox made no representation prior

---

**47.** Although the theory of innocent misrepresentation was invoked in *Black* as a defense, the court noted that it also constitutes a cause of action for damages. The court stated:
 Whether the doctrine of innocent misrepresentation is used to recover damages or as an affirmative defense rescinding or reforming the contract the requirements are the same, since in both instances the object is to make the injured party whole.
 *Black,* 412 Mich. at 118, n. 10, 313 N.W.2d 77.

to that date that it was using National LM 1458 Ns in producing the controllers in production runs one through twenty-six. Indeed, Magnavox could not have done so; production of the controllers did not begin until October, 1974. Finally, the alleged omission of May, 1975 obviously occurred long after the contract was executed and was not part of the contract negotiations.

While it appears that Eaton has failed to satisfy other of the elements required by *Black* as well,[48] the Court need not resolve these issues. Eaton has not established fraudulent misrepresentation, as it produced no evidence of Magnavox's intent. It has not established innocent misrepresentation, either, as none of the alleged misrepresentations occurred in the context of contract negotiations. Accordingly, Eaton's claims of misrepresentation are without merit and must fail.

### E. Negligence

Eaton claims that Magnavox was negligent in three respects in manufacturing the controllers. First, Eaton claims that Magnavox was negligent in producing faulty solder connections. Second, Eaton claims that Magnavox was negligent in substituting Raytheon RC 4558 DN op amps in manufacturing the controllers.[49] Finally, Eaton claims that Magnavox was negligent in failing to respond to Eaton's early warranty claims in 1975 and 1976.[50]

Magnavox, however, has established an insuperable obstacle to Eaton's claims under this theory. This obstacle is based not on Magnavox's conduct, but on the nature of the damages suffered by Eaton. In *McGhee v. General Motors Corp.*, 98 Mich. App. 495, 296 N.W.2d 286 (1980), plaintiff

had purchased a truck tractor from the defendant. Hoping to remove the tractor's transmission for repair, he tilted the cab forward using a device on the cab which was designed for this purpose. The cab fell from the tractor frame onto the ground. Neither the plaintiff nor anyone else was injured, but the tractor sustained serious damage. Plaintiff then brought suit, seeking to recover the expenses of repairing the tractor and an alleged loss of profits caused by his inability to use the tractor.

Plaintiff's complaint included claims of breach of express and implied warranties, fraud, and negligence. Plaintiff alleged in his negligence count that defendant was negligent in failing to inspect the tractor for defects, and in failing to warn plaintiff of the tractor's defects. The trial court dismissed this count for failure to state a claim upon which relief could be granted, and the Court of Appeals affirmed. The court stated:

[N]o cause of action is stated in the complaint, where the foundation of the relationship between the parties is contractual and *no personal injury or damage to property other than the subject goods themselves is alleged.*

*Id.* at 505, 296 N.W.2d 286 (emphasis added). The court thus held that the only damages recoverable under a negligence theory are those for personal injury and property damage; damages for pure economic harm cannot be recovered.

Although *McGhee* was a case of first impression in Michigan, the court relied upon cases in other jurisdictions which supported its holding.[51] In *S.M. Wilson & Co.*

---

**48.** For example, Eaton has made no showing whatsoever that any *injury* resulting from the alleged misrepresentations "inure(d) to the benefit of" Magnavox. *Black,* 412 Mich. at 118, 313 N.W.2d 77.

**49.** Specifically, Eaton claims that Magnavox failed to:
 a. notify Eaton that it was substituting the Raytheon RC 4558 DNs;
 b. inform Eaton of the differences between the National 1458 and the Raytheon 4558;
 c. investigate and discover the differences between the National 1458 and the Raytheon 4558;

 d. investigate the effect of the substitution on the functions of the controllers; and
 e. warn Eaton that *Eaton* should investigate these matters.

**50.** As specific controllers failed in the field, Eaton returned many of them to Magnavox for replacement. Eaton claimed that these isolated failures were the responsibility of Magnavox pursuant to its warranties.

**51.** *See also* W. Prosser, *The Law of Torts* at 665 (4th ed. 1971):
 [T]he seller's liability for negligence covers any kind of physical harm ... But where

*v. Smith International, Inc.*, 587 F.2d 1363 (9th Cir.1978), for example, plaintiff had purchased tunnel boring machinery from defendant, in order to construct a mine shaft for a third party. The defendant had also agreed to provide an employee to supervise the installation and initial operation of the machinery. The court noted that, as in the case at bar, the agreement was a commercial contract between parties of relatively equal bargaining strength.

After it was installed, the machinery did not perform as expected. Defendant was unable to correct the problems in the machinery; plaintiff ultimately discovered that defendant had installed two of the machine's parts improperly.

Plaintiff then filed suit to recover the economic losses allegedly caused by the machine's defects. Plaintiff's complaint included claims of breach of contract, breach of implied warranty, negligence, and misrepresentation. The district court entered judgment in favor of defendant on all of plaintiff's claims, and the Court of Appeals affirmed. In regard to plaintiff's claims of negligence, the court held that where "the injury consists of damage to the goods themselves and the costs of repair of such damage or a loss of profits that the deal had been expected to yield to the buyer", the plaintiff was restricted to those remedies available under the U.C.C. *Id* at 1376. The court concluded that "[e]conomic losses are not recoverable under negligence." *Id.*

Similarly, in *Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 572 S.W.2d 308 (Tex.1978), defendant-petitioner had sold an aircraft to plaintiff-respondent, to be used in spraying crops. Shortly after the purchase, the aircraft crashed when its engine failed. As in *McGhee*, neither the pilot nor anyone else was injured; the aircraft, however, was seriously damaged.

Plaintiff brought suit against several defendants, bringing claims of negligence, breach of warranty, and strict liability in tort. The trial court entered a judgment in favor of plaintiff on his strict liability claim against one of the defendants; on appeal, the Texas Supreme Court reversed and entered judgment in favor of the defendant.[52] Noting that "economic loss resulting from a product with defective workmanship and materials is not recoverable in strict liability", the court held that plaintiff could not recover damages for the damage to the aircraft. *Id.* at 311. Explaining this holding, the court stated:

> In transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the Uniform Commercial Code.

*Id.* at 313.

The only damages sought by Eaton in the case at bar are its costs for investigating the defects in the controllers, and for obtaining and installing the replacement controllers. Eaton does not allege that any personal injury or damage to other property ever occurred as a result of the controllers' defects.[53] Because Eaton seeks to recover economic losses only, its negligence claim cannot be sustained.

Eaton makes two arguments that *McGhee* does not bar its claims for damages. First, Eaton contends that the controllers were "safety devices" and *could have* caused injury to persons and property. This argument misses the point of *McGhee* and the cases cited therein. It

---

there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule ... that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery.

**52.** The trial court also entered a judgment in favor of plaintiff on his negligence claim against another defendant, but this defendant did not appeal the judgment. *Id.* at 310.

**53.** As noted above, Eaton originally sought a declaratory judgment that Magnavox must indemnify Eaton against any claim for personal injury caused by a controller failure. This Court dismissed Eaton's claims for declaratory relief in an order issued on October 29, 1980, however, and they are therefore no longer before the Court.

was equally true, for example, that the defective tractor in *McGhee* and the defective aircraft in *Mid Continent* could have caused serious personal injury. The rule of those cases is that where the defective product has not *in fact* caused injury to persons or other property, a plaintiff cannot recover economic losses under a negligence theory. This is precisely what Eaton seeks to do in the case at bar; under the authority of *McGhee*, it cannot do so.

Second, Eaton contends that *McGhee* does not accurately reflect the law of Michigan on this subject. Eaton relies on two cases in support of this argument; neither is persuasive. Eaton first relies on *U.S. Fibres, Inc. v. Proctor & Schwartz, Inc.,* 358 F.Supp. 449 (E.D.Mich.1972), *aff'd,* 509 F.2d 1043 (6th Cir.1975). The district court did indeed hold in that case that economic damages could be recovered on a negligence theory.[54] That case, however, was decided eight years before *McGhee,* and it must therefore be regarded as no longer controlling. Eaton has cited no post-*McGhee* case which supports its argument that economic damages can be recovered on a negligence theory. In *Upjohn Co. v. Rachelle Laboratories, Inc.,* 661 F.2d 1105 (6th Cir.1981), plaintiff sought to recover economic losses caused by a defective product. As Eaton correctly notes, the district court submitted plaintiff's case to a jury on four theories of liability, including negligence. The propriety of this action was not challenged on appeal, however, and the Court of Appeals nowhere suggested that the trial court's actions were a correct application of Michigan law. In addition, *Upjohn* was argued before the Court of Appeals only three months after *McGhee* was decided. Therefore, it is a virtual certainty that *McGhee* had not yet been decided when the trial court submitted plaintiff's case to the jury on a negligence theory. Because this issue was not raised on appeal, the Court

of Appeals had no occasion to consider whether the trial court's actions were correct in light of that intervening decision.

This Court finds that after *McGhee,* a plaintiff in Michigan cannot recover economic damages caused by a defective product on a negligence theory. These are the only damages sought by Eaton in the case at bar. Therefore, even assuming *arguendo* that Eaton can establish the other elements of its negligence claim,[55] it is barred as a matter of law from recovering the damages it seeks. Eaton's claim of negligence must therefore fail.

### F. *Products Liability*

Finally, Eaton claims that Magnavox designed, manufactured and sold a defective product which caused Eaton's damages. Complaint at ¶ 74. Magnavox earlier moved to dismiss this count for failure to state a claim upon which relief can be granted. In its order of October 29, 1980, this Court denied the motion, finding that this count did set forth an independent theory of recovery. The Court noted that although Michigan has not adopted the theory of strict liability in tort set forth in § 402A of the Restatement (Second) of Torts, it has in essence adopted this doctrine under the guise of implied warranty in tort. *See Johnson v. Chrysler Corp.* 74 Mich.App. 532, 254 N.W.2d 569 (1977); *Continental Casualty Co. v. Westinghouse Electric Corp.,* 327 F.Supp. 720 (E.D.Mich.1970).

As noted above, however, Eaton cannot recover its economic losses under a tort theory. The Court in *McGhee, supra,* held that a plaintiff is restricted to the remedies available under the U.C.C. in attempting to recover economic losses; only damages for personal injury and damage to other property can be recovered in tort. The Court's

---

**54.** This issue was not raised on appeal. Accordingly, the Court of Appeals neither approved nor rejected the district court's holding in this regard.

**55.** In order to prevail on its negligence claim, Eaton would also be required to prove that Magnavox owed a duty to Eaton, that Magnavox breached the applicable standard of care, and

that Eaton's damages were proximately caused by the breach. *Roulo v. Automobile Club of Michigan,* 386 Mich. 324, 192 N.W.2d 237 (1971). In addition, the Court would be required to consider whether Eaton was comparatively negligent in any respect. *Placek v. City of Sterling Heights,* 405 Mich. 638, 275 N.W.2d 511 (1979).

opinion in *McGhee* expressly involved only a claim of negligence, but its logic applies equally to other tort theories. Indeed, the Court relied on one case which did not involve a negligence claim at all, but rather involved only a claim of strict liability. *Mid Continent, supra.* Quoting from that case, the Michigan court stated:

> A hazardous product that has harmed something or someone can be labeled as part of the accident problem; tort law seeks to protect against this type of harm through allocation of risk. In contrast, a damaging event that harms only the product should be treated as irrelevant to policy considerations directing liability placement in tort. Consequently, if a defect causes damage limited solely to the property, recovery should be available, if at all, on a contract-warranty theory.
>
> The Uniform Commercial Code was adopted by the legislature as a comprehensive and integrated act to facilitate the continued expansion of commercial practices. .... Such an expansion of strict liability would frustrate the Code's purposes of codifying the law of commercial transactions by displacing its applicability in all cases where the sale of faulty products is involved. Some losses resulting from product transactions are best covered by contract liability under the Code.

*McGhee,* 98 Mich.App. at 506, 296 N.W.2d 286.

▋ Therefore, the only logical inference to be drawn from *McGhee* is that a plaintiff cannot recover economic losses under the theories of strict liability or implied warranty in tort. In addition to *Mid Continent, supra,* several other courts have also reached this result. *See, e.g., Tokio Marine & Fire Insurance Co., Ltd. v. McDonnell Douglas Corp.,* 617 F.2d 936 (2d Cir. 1980); *Scandinavian Airlines System v. United Aircraft Corp.,* 601 F.2d 425 (9th Cir.1979); *Seely v. White Motor Co.,* 63 Cal.2d 9, 403 P.2d 145 (1965). Eaton has cited no contrary authority.

In support of its claim that it can recover economic losses under an implied warranty in tort theory, Eaton makes only the same arguments which it makes in support of its negligence claim. As noted above, these arguments are without merit. The Court finds as a matter of law that Eaton cannot recover economic losses under its products liability theory. As those are the only damages sought, Eaton's product liability claim cannot be supported.

### III. CONCLUSION

Eaton has been unable to sustain any of its claims against Magnavox. The Court therefore finds that Magnavox is not liable for any of the damages claimed by Eaton, and will enter judgment in favor of Magnavox on all counts.

IT IS SO ORDERED.

### APPENDIX A

### EATON CORPORATION

### PURCHASE ORDER

### TERMS AND CONDITIONS

1. ACCEPTANCE OF CONTRACT: Eaton Corporation, hereinafter referred to as "Buyer", shall not be bound by this order until Seller executes and returns to Buyer the acknowledgment copy of this order. Seller shall be bound by this order and its terms and conditions when it executes and returns the acknowledgment copy, when it otherwise indicates its acceptance of this order, or when it delivers to Buyer any of the goods ordered herein or renders for Buyer any of the services ordered herein. This order expressly limits acceptance to the terms and conditions stated herein, and any additional or different terms proposed by the Seller are rejected unless expressly assented to in writing by Buyer. No contract shall exist except as hereinabove provided. *Notwithstanding the content of this Provision it is specifically understood that the Seller's acceptance of this Purchase Order is contingent upon modifying the following referenced Article as stated.*

2. AMENDMENTS: The parties agree that this purchase order, including the

terms and conditions on the face and reverse side hereof together with any documents attached hereto or incorporated herein by reference, contains the complete and final contract between Buyer and Seller; that no agreement or understanding to modify this contract shall be binding upon Buyer unless in writing and signed by Buyer's authorized representatives. All specifications, drawings, and data submitted to Seller with this order or referred to by this order are hereby incorporated herein and made a part of this contract.

3. CHANGES: The Buyer reserves the right at any time to make written changes in any one or more of the following: (a) Specifications, drawings and data incorporated in this contract where the items to be furnished are to be specially manufactured for the Buyer; (b) Methods of shipment or packing; (c) Place of delivery; (d) Time of delivery; (e) Manner of delivery; and (f) Quantities.

If any such change causes an increase or decrease in the cost of or the time required for performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both. Any claim by Seller for adjustment under this clause must be approved by the Buyer in writing before the Seller proceeds with such change. Price increases shall not be binding on Buyer unless evidenced by a purchase order change notice or revision issued and signed by Buyer.

4. DELIVERY: [Time is of the essence in this contract, and] if delivery of goods is not made in the quantities and at the times specified, or rendering of services is not completed at the times specified, Buyer reserves the right without liability, and in addition to its other rights and remedies, to take either or both of the following actions: (a) direct expedited routings of goods (the difference in cost between the expedited routing and the order routing costs shall be paid by Seller); (b) terminate this contract by notice effective when received by Seller as to stated goods not yet shipped or services not yet rendered, and to purchase substitute goods or services elsewhere and charge Seller with any loss incurred.

Seller shall be liable for excess transportation charges, delays or claims resulting from Seller's deviation from Buyer's routing instructions. Neither party shall be liable for excess costs of deliveries or defaults due to causes beyond its control and without its fault or negligence, provided, however, that when the Seller has reason to believe that deliveries will not be made as scheduled, written notice setting forth the cause of the anticipated delay will be given immediately to Buyer. If Seller's delay or default is caused by the delay or default of a subcontractor, such delay or default shall be excusable only if it arose out of causes beyond the control of both Seller and subcontractor and without the fault or negligence of either of them and the goods to be furnished or services to be rendered were not obtainable from other sources in sufficient time to permit Seller to meet the required delivery or performance schedule.

Buyer will have no liability for payment for goods delivered to Buyer which are in excess of quantities specified in this contract and delivery schedules. Such goods shall be subject to rejection and return at Seller's expense, including transportation charges both ways. Buyer will not be liable for any material or production costs incurred in excess of the amount or in advance of the time necessary to meet Buyer's delivery schedules.

5. INSPECTION AND ACCEPTANCE: Payment for any goods under this contract shall not constitute acceptance thereof. All goods purchased hereunder are subject to inspection at Buyer's destination either before or after payment or before [or after] acceptance, at Buyer's option. Buyer reserves the right to reject and refuse acceptance of goods which are not in accordance with the instructions, specifications, drawings and data or Seller's warranties [(express or implied)]. Goods *which are rejected for cause and* not accepted will be returned to Seller for full credit or replacement at Buyer's option and at Seller's risk and expense, including transportation charges both ways. No replacement of

rejected goods shall be made unless specified by Buyer in writing.

[Buyer shall not be liable for failure to accept any part of the goods,] *Neither Buyer nor Seller shall be liable for failure to accept or deliver any part of the goods,* if such failure is the result of any cause beyond the control of Buyer *or Seller.* Among such causes, but not definitive thereof, are fires, floods, Acts of God, strikes, differences with employees, casualties, delays in transportation, shortages of cars, inability to obtain necessary materials or machinery or total or partial shutdown of Buyer's *or Seller's* plant for any cause.

Acceptance of any part of the goods shall not bind Buyer to accept future shipments, nor deprive it of the right to return goods already accepted.

[Acceptance of all or any part of the goods shall not be deemed to be a waiver of Buyer's right either to cancel or to return all or any portion of the goods because of failure to conform to this contract, or by reason of defects, latent or patent, or other breach of warranty, or to make any claim for damages, including manufacturing costs, damage to materials or articles caused by improper boxing, crating or packing, and loss of profits or other special damages occasioned the Buyer. Such rights shall be in addition to any other remedies provided by law.]

*Buyer's acceptance of part of the goods shall not be deemed to be a waiver of Buyer's right either to cancel or to return any other portion of the goods because of failure to conform to this contract. However, Buyer's acceptance of goods will be considered to be final except as to latent defects, fraud or gross mistakes amounting to fraud.*

6. PACKING, DRAYAGE AND CONTAINERS: No charges for packing, drayage or containers will be allowed unless specified on the face of this order, or specifically listed as an additional and separate charge on Seller's quotation and acceptance of this order. Seller shall be liable for damage to materials or articles described herein caused by improper boxing, crating or packing.

7. SELLER'S WARRANTIES: [Seller hereby warrants that the whole of the goods furnished hereunder shall be of merchantable quality and fit for Buyer's purposes and that they shall conform with Buyer's instructions, specifications, drawings and data. Seller hereby further warrants that the whole of the goods furnished hereunder shall conform to all representations, affirmations, promises, descriptions, samples or models forming the basis of this contract. Seller agrees that these warranties shall survive acceptance of the goods. Said warranties shall be in addition to any warranties of additional scope given by Seller to Buyer. None of said warranties and no other implied or express warranties shall be deemed disclaimed or excluded unless evidenced by a purchase order change notice or revision issued and signed by Buyer.]

*Delete pending final negotiations on specifications, acceptance test details and MTBF. It is our intent to warrant against defects in workmanship and material for a period of twelve months after delivery and to indemnify Eaton against non-conformances to specifications but in no instance will Magnavox accept responsibility for consequential damages.*

8. PROPERTY OF BUYER: Unless otherwise provided in this order or agreed to in writing, property of every description including but not limited to all tooling, tools, equipment and material furnished or made available to Seller, title to which is in Buyer, and any replacement thereof shall be and remain the property of Buyer. Property other than material shall not be modified without the written consent of the Buyer. Such property shall be plainly marked or otherwise adequately identified by Seller as "Property of Eaton Corporation["] and shall be safely stored separately and apart from Seller's property. Seller shall not use such property except for performance of work hereunder or as authorized in writing by Buyer. Such property while in Seller's possession or control shall be kept in good condition, shall be held at Seller's risk, and shall be kept insured by Seller, at its expense, in an amount equal to

the replacement cost with loss payable to Buyer. To the extent such property is not material consumed in the performance of this order, it shall be subject to inspection and removal by Buyer and Buyer shall have the right of entry for such purposes without any additional liability whatsoever to Seller. As and when directed by Buyer, Seller shall disclose the location of such property and/or prepare it for shipment and ship it to Buyer in as good condition as originally received by Seller, reasonable wear and tear excepted.

9. SPECIAL TOOLING: The term "special tooling" as used in this clause shall be deemed to include all jigs, dies, fixtures, molds, patterns, special cutting tools, special gauges, special test equipment, other special equipment and manufacturing aids, and drawings and any replacements of the foregoing, acquired or manufactured or used in the performance of this order, which are of such a specialized nature that, without substantial modification or alteration, their use is limited to the production of the supplies or parts thereof or performance of the services of the type required by this order. The term does not include (a) items of tooling or equipment heretofore acquired by Seller, or replacement thereof, whether or not altered or adopted for use in the performance of this order, (b) consumable small tools, (c) general or special machine tools or similar capital items, or (d) tooling, title to which is in Buyer.

Seller agrees that special tooling shall be retained and not used or reworked except for performance of work hereunder or as authorized in writing by Buyer. While in Seller's possession or control, Seller warrants that it will keep the special tooling in good condition fully covered by insurance, and will replace it when lost, destroyed, or necessary for performance of work hereunder. Upon cessation or termination of the work under this order for which the special tooling is required, Seller shall furnish Buyer a list of the products, parts, or services for the manufacture or performance of which such special tooling was used or designed and a list indicating where each item of the special tooling is located, and

shall transfer title to and possession of the special tooling to Buyer for an amount equal to the unamortized cost thereof, or dispose thereof as Buyer may direct in writing. In addition, Buyer shall have the right to take possession of, including the right of entry for such purpose, any special tooling, title to which Buyer acquires hereunder, without any additional liability whatsoever to Seller.

10. PROPRIETARY RIGHTS: All technical information in the nature of designs, blueprints, specifications, engineering data for production or product know-how, which is *identified in writing as proprietary and* supplied to the Seller by the Buyer to facilitate or assist in the performance of this contract, shall, unless otherwise agreed, be considered and kept confidential by the Seller, and the Seller will use and cause its employees and agents to use extreme caution not to disclose any such information either directly or by incorporation of such information in or its use in manufacturing products for others. Additionally, Seller agrees to assign to the Buyer and not otherwise to make use of any invention, improvement or discovery (whether or not patentable), conceived or reduced to practice in the performance of this contract by any employee of the Seller or other person working under Seller's direction, and such assignment shall be considered as additional consideration for the making of this contract. Upon completion of performance of this contract, the Seller shall deliver to the Buyer any and all information relating to any such invention, improvement or discovery, and shall cause employees or others subject to Seller's instructions to sign as appropriate all documents necessary or convenient to enable the Buyer to file applications for patents throughout the world and to obtain title thereto.

11. PATENT INDEMNITY CLAUSE: The Seller agrees, upon receipt of notification, to promptly assume full responsibility for the defense of any suit or proceeding which may be brought against Eaton Corporation, or any of its subsidiaries, constituent companies, agents or vendees, herein-

after for purposes of this Section collectively referred to as the Buyer, for alleged patent infringement, as well as for the alleged unfair competition resulting from similarity in design, trademark, or appearance of goods, by reason of the use or sale of any goods furnished under this contract, except for goods manufactured entirely to Buyer's specifications; and the Seller further agrees to indemnify Buyer against any and all expense, loss, royalties, profits and damages, including court costs and attorneys' fees, resulting from the bringing of such suit or proceedings, including any settlement or decree or judgment entered therein. The Buyer may be represented by and actively participate through its own counsel in any such suit or proceedings, if it so desires. The Seller's obligations hereunder shall survive acceptance of the goods and payment therefor by the Buyer.

12. INDEMNIFICATION: [Seller further agrees to indemnify and save Buyer harmless from any and all losses, liabilities, damages, claims, demands, suits, actions, proceedings, subrogations and expenses, including court costs and reasonable attorneys' fees, related in any way to this contract, or the services performed or goods delivered under this contract, except for goods manufactured entirely to Buyer's specifications, which are claimed or made by any person, firm, association or corporation, including employees, workmen, servants or agents of the Seller and his subcontractors arising from any cause or for any reason whatsoever. Seller further agrees, upon receipt of notification, to promptly assume full responsibility for the defense of any and all such suits, actions or proceedings which may be brought against Seller or against Buyer. In the event Buyer's machinery or equipment is used by Seller in the performance of any work that might be required under this contract, such machinery or equipment shall be considered as being under the sole custody and control of Seller during the period of such use by Seller.]

*Delete pending final negotiations on specifications, acceptance test details and MTBF. It is our intent to warrant against defects in workmanship and ma-*

*terial for a period of twelve months after delivery and to indemnify Eaton against non-conformances to specifications but in no instance will Magnavox accept responsibility for consequential damages.*

13. INSURANCE: If this contract covers the performance of labor for Buyer, Seller agrees to indemnify and protect Buyer against all liability, claims or demands for injuries or damages to any person or property growing out of the performance of this contract. Seller further agrees to furnish Insurance Carrier's Certificate showing that Seller has adequate insurance coverage in the following minimum amounts:

Workmen's Compensation—Statutory limits for State or States in which the work is to be performed. General Public Liability $100,000/$300,000 and Property Damage $50,000, Automobile Public Liability $50,000/$100,000 and Property Damage $50,000.

Said Certificate must set forth the amount of coverage, number of policy and date of expiration. If Seller is a self-insurer, the Certificate of the Department of Labor and Industry of the State of which said labor is to be performed must be furnished by such Department directly to Buyer. Compliance by Seller with insurance requirements does not in any way affect Seller's indemnification of Buyer under Article 12 above.

14. CANCELLATION: Buyer shall have the right to cancel for default all or any part of the undelivered portion of this contract if Seller does not make deliveries as specified in the delivery schedule, if Seller breaches any of the terms hereof including warranties of Seller, or if Seller becomes insolvent or commits an act of bankruptcy. If it is determined, however, that Seller's failure to perform this contract is due to unforeseeable causes beyond the control and without the fault or negligence of Seller (other than insolvency or an act of bankruptcy) such cancellation shall be deemed to have been made pursuant to Article 15 hereof entitled "Termination", provided that such causes shall include delays and defaults of subcontractors only to

the extent such causes are beyond the control of both Seller and subcontractor and without the fault or negligence of either of them and the goods to be furnished were not obtainable from other sources in sufficient time to permit Seller to meet the required delivery schedule.

Such right of cancellation is in addition to and not in lieu of any other remedies which Buyer may have in law or equity.

15. TERMINATION: The Buyer may terminate performance of work under this order in whole or from time to time in part by written notice of termination, whereupon the Seller will stop work on the date and to the extent specified in the notice and terminate all orders and subcontracts to the extent they relate to the terminated work. Seller will promptly advise the Buyer of the quantities of applicable work and material on hand or purchased prior to termination and the most favorable disposition that the Seller can make thereof. Seller will comply with the Buyer's instructions regarding transfer and disposition of title to the possession of such work and material. Within 60 days after receipt of such notice of termination, the Seller will submit all its claims resulting from such termination. Buyer will have the right to check such claims at any reasonable time or times by inspecting and auditing the records, facilities, work or materials of the Seller relating to this order. Buyer will pay the Seller, without duplication, the order price for finished work accepted by the Buyer and the cost to the Seller of work in process and raw material allocable to the terminated work, based on any audit the Buyer may conduct and generally accepted accounting principles; less, however, (a) the reasonable value or cost (whichever is higher) of any items used or sold by the Seller without the Buyer's consent; (b) the agreed value of any items used or sold by the Seller with the Buyer's consent; and (c) the cost of any defective, damaged or destroyed work or material. Buyer will make no payments for finished work, work in process or raw material fabricated or procured by the Seller in excess of any order or release. Notwithstanding the above, payments made under this clause shall not exceed the aggregate price specified in this order less payments otherwise made or to be made, and adjustments shall be made reducing the payments hereunder for costs of work in process and raw material to reflect on a pro rata basis any indicated loss on the entire contract had it been completed. Payment made under this clause will constitute the Buyer's only liability in the event this order is terminated hereunder. Except as otherwise provided in this order, the provisions of this clause will not apply to any cancellation by the Buyer for default by the Seller or for any other cause allowed by law or under this order.

16. COMPLIANCE WITH APPLICABLE LAWS: Seller agrees that, in the performance of this contract, it will comply with all applicable laws, statutes, rules, regulations or orders of the United States government or of any state or political subdivision thereof. Without limiting the generality of the foregoing, Seller agrees that it will include on all invoices, and that all invoices in order to be approved for payment must include the following statement:

"Seller represents that, with respect to the production of the goods covered by this invoice, it has fully complied with all provisions of the Fair Labor Standards Act of 1938, as amended."

17. NON–DISCRIMINATION IN EMPLOYMENT: The Seller agrees that the representations and provisions required by Section 202 of Executive Order No. 11246 of September 24, 1965, as to non-discrimination in employment are hereby incorporated in and made a part of this contract.

18. WAIVER: The failure of Buyer to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this contract or to exercise any right hereunder, shall not be construed as a waiver or relinquishment of the future performance of any such terms, covenants or conditions or the future exercise of such right, but the obligation of Seller with respect to such future performance shall continue in full force and effect.

19. ASSIGNMENT: None of the sums due or to become due nor any of the work to be performed under this contract shall be assigned nor shall Seller subcontract for completed or substantially completed material called for by this contract without Buyer's prior written consent.