RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0467p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ALTERNATIVE AVIATION SERVICES, INC.,
　　　　　　　　　　　　*Plaintiff-Appellant,*

　　　*v.*

MEGGITT [UK] LTD., d/b/a MEGGITT AVIONICS, and
VIBRO-METER, INC., f/k/a MEGGITT AVIATION, INC.,
　　　　　　　　　　　　*Defendants-Appellees.*

No. 05-2334

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-72062—Anna Diggs Taylor, District Judge.

Argued: December 1, 2006

Decided and Filed: December 22, 2006

Before: MARTIN, NORRIS, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Brian G. Shannon, JAFFE, RAITT, HEUER & WEISS, Southfield, Michigan, for Appellant. Ronald M. Greenberg, BERKES CRANE ROBINSON & SEAL, Los Angeles, California, for Appellees. **ON BRIEF:** Brian G. Shannon, JAFFE, RAITT, HEUER & WEISS, Southfield, Michigan, for Appellant. Ronald M. Greenberg, BERKES CRANE ROBINSON & SEAL, Los Angeles, California, Kathryn J. Humphrey, Kathleen McCree Lewis, DYKEMA GOSSETT, Detroit, Michigan, Lauren M. London, DYKEMA GOSSETT, Ann Arbor, Michigan, for Appellees.

---

## OPINION

---

　　　BOYCE F. MARTIN, JR., Circuit Judge. Plaintiff Alternative Aviation Services, Inc., a Michigan-based aviation equipment installation company, brought suit against defendants Meggitt [UK] Ltd. (a British-based company doing business as Meggitt Avionics), Meggitt PLC, and Vibro-Meter, Inc. (formerly known as Meggitt Aviation, Inc). The suit against Meggitt PLC was subsequently dismissed. Alternative alleged breach of express and implied warranty, fraud, and revocation of acceptance in connection with equipment it purchased from Meggitt. Meggitt counterclaimed for breach of contract in order to receive the remaining amount owed on the

1

equipment. Meggitt moved for summary judgment on all of Alternative's claims. Alternative moved for partial summary judgment on its breach of express and implied warranty claims. The district court granted Meggitt's motion for summary judgment, denied Alternative's partial motion for summary judgment, and granted summary judgment as to Meggitt's counterclaim. For the reasons below, we **AFFIRM** the judgment of the district court.

I

## A. Background

On January 20, 2005, the Federal Aviation Administration ("FAA") implemented its Reduced Vertical Separation Minimum ("RVSM") program. RVSM regulations had been in effect in other parts of the world for several years prior to 2005.[1] Pre-RVSM, airplanes were required to fly with at least 2,000 feet vertical separation from one another. However, aircraft approved for flight within RVSM airspace may fly 1,000 feet apart. The purpose of RVSM regulations is to allow a larger number of aircraft to fly at fuel-efficient altitudes (approximately 29,000 to 41,000 feet) at the same time. Although newer aircraft are being built with RVSM-compliant altimeters,[2] older aircraft must be retrofitted with more precise altimeters in order to achieve RVSM compliance. Aircraft that are not properly equipped are not allowed to fly in RVSM airspace. *See* 14 C.F.R. § 91, app. G.

Looking toward 2005, Alternative hoped to be one of the first North American companies to retrofit its customers' transport aircraft[3] with altimetry systems that would be FAA-approved for flight in RVSM airspace. To this end, Alternative contracted with Meggitt to purchase altimeters that would serve as components in Alternative's retrofitted systems. As the installer, it was Alternative's responsibility, not Meggitt's, to present these systems to the FAA and obtain approval in the form of a Supplemental Type Certificate ("STC"). *See* 14 C.F.R. § 21.113 ("Any person who alters a product by introducing a major change in type design, not great enough to require a new application for a type certificate under § 21.19, shall apply to the Administrator for a supplemental type certificate . . . ."). An STC is required in order to flight certify an aircraft that is retrofitted with a new altimetry system. Two kinds of STCs from the FAA are required: a hardware STC, which is the STC for the equipment itself, and a performance STC, which is based on the performance of the installed equipment in use. Ultimately, Alternative obtained the performance STC but not the hardware STC. This failure to obtain approval rendered the system useless.

## B. The Alternative-Meggitt Contract

Alternative began preparing to retrofit aircraft for RVSM compliance several years before the FAA's RVSM program was to take effect. On December 2, 1997, Alternative's John Shirk contacted Meggitt's Bryan Bullen, inquiring about Meggitt's "line of RVSM instruments" because Alternative was "working on a Lockheed Jetstar II RVSM solution." Joint App'x at 83. Bullen

---

[1] Of particular relevance to this case is the fact that the Civil Aviation Authority, a public corporation established by the United Kingdom Parliament as an independent aviation regulator and provider of air traffic services, had already approved Meggitt's equipment for use in aircraft flying in RVSM airspace.

[2] An altimeter is an instrument that displays a plane's altitude, and is thus necessary in order to determine a plane's "vertical separation" from other nearby planes.

[3] The particular type of aircraft this case concerns is called a Part 25 Transport Aircraft, which is of a certain weight, carries passengers, and is certified under Part 25 of the Federal Aviation Regulations. *See* 14 C.F.R. § 25.1. Examples include the Lockheed Jetstar, the Israel Westwind, and the Falcon.

responded via fax on December 18 with "preliminary data regarding the Meggitt Avionics solution to the RVSM requirements." *Id*. at 85. Bullen's fax stated, in pertinent part,

> the Altimeter and Air Data Unit have the applicable FAA TSO approval,[4] are flight certified and in full production for both civil and military transport applications in the UK and USA as follows:-
> > UK RAF VC10 aircraft[5] — RVSM requirement (Altimeter / Alerter / Air Data Unit)
> > Raytheon / Beech 1900D[6] — Altimeter replacement (Altimeter).

*Id*. Bullen then faxed Alternative's Tod Wulff additional information, including brochures describing the technical aspects of the components. This information referred to Meggitt's product as "the Meggitt Avionics RVSM system." *Id*. at 104. In fact, one brochure described the system as "meeting RVSM requirements,"[7] and suited for "New or Retrofit Programmes," for "[a]ny Commercial or Military fixed wing or rotary wing aircraft," including "transport aircraft" — the specific type that Alternative sought to retrofit. *Id*. at 113-15. Alternative claims it relied upon this language to mean that Meggitt was promising that its components would be approved by the FAA.

Negotiations between Alternative and Meggitt continued over the next couple of years. On October 26, 1999, Meggitt's John Perry emailed Alternative's Wulff with a correction to an earlier misstatement made in the December 18, 1997 fax. Perry informed Wulff that in fact, the RVSM system "proposed to Alternative Avionics does not currently have FAA TSO approval . . . ." *Id.* at 181.[8] Three days later, Perry followed up with Wulff, stating that the proposed design intended for Alternative was in service with the UK's VC-10 aircraft, and that in order to deliver the product, Meggitt would need to apply for FAA TSO approval. Meggitt informed Alternative on November 16, 1999, that it could deliver its altimeters no earlier than September 2000. On February 16, 2000, Meggitt sent a proposal to Alternative for the sale of "RVSM compliant Altimetry systems." On March 22, 2000, Alternative ordered ten RVSM Airdata System Shipsets[9] from Meggitt for $53,190 apiece.

---

[4] Before a manufacturer (here, Meggitt) can produce and sell equipment in the United States, it must first receive a type of FAA approval called a Technical Standard Order ("TSO") certification. However, obtaining TSO certification does not necessarily mean that the equipment will be certified for use in a particular type of aircraft.

[5] A VC-10 aircraft is similar to a Part 25 aircraft under FAA's definition, but is not technically a Part 25 aircraft because it is not classified under the United States Federal Aviation Regulations. In essence, it is the UK version of a Part 25 aircraft. Both parties agree that even though the VC-10 is unclassified, it meets the technical criteria of a Part 25 aircraft. As discussed *infra*, relevant to the case at bar is the fact that the VC-10 aircraft — which were retrofitted with the same exact type of Meggitt altimeters sold to Alternative — were certified for flight in RVSM airspace by the UK's Civil Aviation Authority.

[6] The Raetheon/Beach 1900-D is a Part 23 aircraft, which is smaller than a Part 25 aircraft. The FAA has flight certified a Meggitt altimeter for use as part of the primary flight display system in a Raetheon/Beach 1900D, but not in the RVSM context, because most Part 23 aircraft do not reach the height of RVSM airspace.

[7] Notably, the brochure did not specify which country or countries' RSVM requirements it was referring to.

[8] Apparently, this initial confusion regarding whether the FAA had TSO-approved the proposed altimeter stemmed from the fact that the altimeter's initial military customer did not require TSO-approved equipment for RVSM qualification.

[9] A "shipset" consists of two altimeters, two Air Data Units, and some ancillary components. For safety reasons, aircraft are equipped with two altimetry systems.

Meggitt finally obtained TSO approval for the equipment incorporated in Alternative's "RVSM Solution" in March 2001. Delivery began in April 2001. Between April 4, 2001, and August 31, 2001, Alternative installed eight shipsets of equipment on eight customers' Part 25 aircraft. On September 21, 2001, Alternative ordered another ten shipsets of Meggitt's equipment. It appears that Alternative first applied for a hardware STC on October 17, 2001. Thus, Alternative had installed eight shipsets and ordered ten more before applying for the hardware STC. Alternative installed four more shipsets in Part 25 aircraft after applying for the hardware STC on October 31, 2001, November 30, 2001, May 24, 2002, and June 3, 2002.

After reviewing Alternative's application for a hardware STC, the FAA found that the equipment was not certifiable for two reasons: (1) Level A software was required, and the Meggitt equipment used Level B software,[10] and (2) High Intensity Radiative Fields ("HIRF") special conditions[11] were not met.[12]

On July 2, 2002, Meggitt expressed to Alternative that it "[could] see no 'loop holes' that would get the FAA to change their mind." *Id.* at 228. On August 16, 2002, Meggitt sent a letter to Alternative stating, *inter alia*, it would not be able to provide Level A software before the end of 2003.

On December 27, 2002, Alternative's counsel informed Meggitt that Alternative was revoking its acceptance of Meggitt's equipment. Alternative claims it gave Meggitt a commercially reasonable time to cure defects in its equipment, but after it was clear that the FAA would not RVSM-certify the altimetry systems, it chose to revoke acceptance.

## C. Procedural History

The district court granted Meggitt's motion for summary judgment and denied Alternative's motion for partial summary judgment. On the breach of express and implied warranty claims, the district court found that (1) "a party cannot be held liable for breach of warranty based on the promise of future conduct of any independent government entity," and (2) Meggitt's statements "cannot be construed as a promise of future compliance." *Id.* at 681-82. The district court rejected Alternative's fraud claim, finding no evidence of intent to defraud. *Id.* at 710. Finally, the district court dismissed Alternative's revocation of acceptance claim because Alternative's customers had been using the equipment for years and were continuing to use it. Further, Alternative did not have physical possession of the Meggitt equipment, which prevented Alternative from returning it. *Id.* at 710-11.

Meggitt subsequently moved for summary judgment in order to recover the remaining amount owed by Alternative to Meggitt. Meggitt had invoiced Alternative a total of approximately $893,925 for the 20 altimeters, of which Alternative had paid $658,065. The court awarded Meggitt the balance, $240,860, plus prejudgment interest of $18,863.71. *Id.* at 720-21.

---

[10]There are several levels of software used in altimeters. The relevance of software levels in this case is simply that Level A is a higher level of software than Level B, and the FAA determined that it was going to require Level A software in the altimeters used to retrofit transport aircraft for RVSM compliance.

[11]This refers to a condition in the environment that could cause electrical currents to be induced onto the equipment, which would cause the equipment to malfunction. According to FAA engineer Brenda Ocker, who reviewed Alternative's application for an STC, an issue paper supplementing the FAA's written rules required HIRF testing as a special condition that would apply to installation of altimeters in the type of aircraft at issue. Joint App'x at 219-20.

[12]This is not to say that everything else in the system necessarily was fine. Rather, once these two problems were noticed, the FAA ceased processing the STC application. Joint App'x at 221 (excerpt from 6/22/04 deposition of the FAA's Brenda Ocker).

II

We review *de novo* a district court's decision to grant summary judgment. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id*. (quoting Fed. R. Civ. P. 56(c)). The party moving for summary judgment has the burden of demonstrating that there is no genuine issue of material fact. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). We view all evidence and construe all facts and inferences in the light most favorable to the non-moving party. *Id*. (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp,*, 475 U.S. 574, 587 (1986)).

III

Alternative argues that based on the correspondence and literature provided by Meggitt, Meggitt expressly and impliedly warranted that its equipment was RVSM-compliant in transport aircraft. Based on the record before us, we find that there is no issue of material fact, for the facts show that no inference can be made that Meggitt warranted, expressly or impliedly, that its altimeters would be RVSM-compliant under the FAA's standards.

Pursuant to Michigan law,

(a) An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) A description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Mich. Comp. Laws. § 440.2313. Michigan law also provides that unless excluded or modified, an implied warranty of fitness for a particular purpose is created "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods . . . ." Mich. Comp. Laws. § 440.2315.

Before addressing whether or not Meggitt made any warranties, we must resolve the parties' dispute over what exactly Alternative is arguing that Meggitt promised. Alternative contends that Meggitt and the district court mischaracterized its argument, for it is arguing *not* that Meggitt expressly and impliedly warranted FAA approval of a hardware STC application, but rather, that its altimetry system would be RVSM-compliant in transport aircraft. However, we fail to see how these statements are distinguishable for purposes of this lawsuit.[13] An altimetry system that is "RVSM-compliant" under Alternative's definition is an altimetry system that will be certified by the FAA for flight in RVSM airspace in the United States. Thus, Alternative intends an "RVSM-compliant"

_____

[13]We can see how these two things — (1) an RVSM-compliant altimetry system, and (2) FAA approval in general — would in some instances be mutually exclusive. Presumably, for example, Meggitt could have supplied an altimetry system which in and of itself raised no red flags with the FAA, yet the FAA could refuse to certify the system for a host of other possible reasons, such as something pertaining to Alternative's design and installation of the system. However, this case is not about FAA approval in general, but rather, FAA approval with respect to a specific component of the installation, namely, Meggitt's altimeter.

altimetry system to mean one to which the FAA must necessarily grant a performance STC and a hardware STC, both of which are preconditions for approval.[14]

Alternative argues that Meggitt's December 2, 1997, fax to Alternative conveyed that the proposed altimeter had TSO approval and was flight certified in the United States. However, Meggitt followed up two years later (and months before Alternative actually purchased the shipsets) and explicitly corrected this earlier statement, saying that in fact, the FAA had *not* yet granted TSO approval to the proposed altimeter. Alternative attacks this correction, contending that it only cured the information regarding the TSO, not the flight certification, and argues that it "relied on Meggitt's claim that the VC-10 was 'flight certified.'" We find this argument unavailing, for even if Meggitt's statements are construed in the light most favorable to Alternative, they only establish flight certification of the VC-10 aircraft used in the UK, not the similar but distinct Part 25 aircraft. *See supra* note 5. The VC-10 is merely a Part 25-*equivalent* aircraft. Thus, it was perfectly clear that while *UK authorities* had certified Meggitt's equipment for use in a Part 25-*equivalent* aircraft, the *FAA* had not yet certified Meggitt's equipment in Part 25 aircraft.

Generally, Alternative takes issue with Meggitt's use of "RVSM" and "RVSM compliant" in describing its altimeters. By using this terminology, Alternative posits, Meggitt was promising RVSM approval by the FAA. Construing (and perhaps stretching) this in the light most favorable to Alternative, we can see that if "RVSM" was a term used solely by the United States and the FAA, and if the term "RVSM-compliant" only referred to compliance with the FAA's standards, this argument might have some merit. However, the term "RVSM" was not only used by the United States; rather, the United Kingdom also used the same acronym. Further, by the time of Alternative's first purchase order on March 22, 2000, it is undisputed that the proposed equipment had already been flight certified by the UK for use in VC-10 aircraft flying in RVSM airspace. Thus, even if "RVSM" is read to imply compliance with RVSM standards, Meggitt's components *did* in fact comply with the UK's RVSM standards. In a nutshell, interpreting Meggitt's statements as a promise that the FAA would approve this equipment would be unreasonable, for (1) Alternative knew that the FAA had not yet certified this equipment, (2) Alternative knew that it — not Meggitt — would bear the burden of obtaining FAA approval, and (3) Meggitt's equipment *was* in fact RVSM-compliant — but with the UK, not American, authorities. As a sophisticated installer of avionics equipment, Alternative should have been aware that the standards were not identical in the two countries and should not have relied on Meggitt's statements as a guarantee of FAA certification — at least without following up on this point.

The record shows that at the time of its purchase, Alternative was fully aware that Meggitt could not possibly promise FAA certification. This awareness is evidenced by Alternative employee John Shirk's deposition testimony:

> The assertion was that it [the altimeter] was already approved for air transport category airplanes [such as the VC-10] and so there would be no reason why we wouldn't assume or plan on them being certified in additional Part 25 airplanes or additional air transport category airplanes, *but no manufacturer is ever guaranteed or — that something is going to be approved or certified.*

---

[14] Alternative strives so hard to distinguish its argument (based on "RVSM-compliance") from one purporting that Meggitt promised future governmental approval presumably because the district court ruled (and possibly we would agree) that Meggitt could not be held liable for breach of warranty based on the promise of future conduct by the FAA. However, we find that even if Meggitt *could* promise future government approval, the record reveals that Meggitt never used any language that Alternative could reasonably interpret as making such a promise. Meggitt made absolutely no warranty — express or implied — that the FAA would certify its altimeters as RVSM-compliant. Therefore, we need not address the separate issue of whether Meggitt could warrant future government conduct. Nevertheless, our resolution of the parties' dispute over Alternative's characterization of its argument is relevant to Alternative's fraud claim, discussed in Part IV of this opinion.

Joint App'x at 510 (emphasis added). With this knowledge of the FAA's certification procedures, it would be entirely unreasonable for Alternative to believe that Meggitt was guaranteeing FAA certification. *Cf. City of Ypsilanti v. Appalachian Ins. Co.*, 547 F. Supp. 823, 826 (E.D. Mich. 1982) (noting, in the context of an insurance policy, that "[i]n construing the language of a contract, the court must avoid that which is unnatural or unreasonable if the language will also bear a construction which is fair and reasonable."). Alternative's lawsuit is simply a creative attempt, made in hindsight, to try to minimize its losses on a risky gamble.

In sum, Meggitt did no more than give Alternative the exact product, with the exact specifications, that Alternative contracted to receive.[15] Alternative knew that the equipment was not flight certified and that it was incumbent upon Alternative — not Meggitt — to apply for the hardware and performance STCs. Alternative was fully aware that the *only* way to determine whether the FAA would approve the system was to apply for the STCs. Alternative's argument that Meggitt promised that the FAA would approve the system is simply without support. *Cf. Wembelton Development Co. v. Travelers Ins. Co.*, 45 Mich. App. 168, 172 (Mich. Ct. App. 1973) ("Courts will not interpret a contract in a manner which would impose an absurd or impossible condition on one of the parties."). For these reasons, we find that Meggitt never expressly or impliedly warranted flight certification by the FAA.

IV

We next turn to Alternative's claim of fraud. Under the economic loss doctrine, "[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic' losses." *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 520 (Mich. 1992) (internal quotation marks and citations omitted). However, the Michigan Court of Appeals has held that fraud in the inducement is an exception to the economic loss doctrine. *Huron Tool and Engineering Co. v. Precision Consulting Services Inc.*, 209 Mich. App. 365, 368 (Mich. Ct. App. 1995). Thus, in some circumstances, a plaintiff alleging breach of contract may also have a remedy in tort.

Alternative claims that Meggitt falsely misrepresented that (1) its system was already flight certified for transport aircraft, and (2) that it was "RVSM-compliant." Under Michigan law, the elements constituting actionable fraud are:

---

[15]With respect to these specifications, both parties make hay out of the Level A / Level B software issue. Meggitt notes that in 1999 an Alternative employee acknowledged that the altimeters used a lower level of software and that Alternative could better serve its customers if it used Level A software. Alternative responds that it only knew that there were "reliability" issues with using Level B software, but it did not know that it "was a fatal design deficiency in an altimetry system intended for use in Part 25 transport aircraft." Despite the time the parties spend quibbling over Alternative's knowledge of the software being used, we do not believe that it is in any way dispositive. Even if one characterizes use of Level B software as "a fatal design deficiency," we fail to see how Alternative's own inability to predict whether Level B software would be approved has any bearing on Meggitt's liability, as the record reveals that Meggitt was equally unable to forecast what the FAA would do.

The only way that this issue would be relevant to the warranty (or fraud) claims would be if Meggitt knew all along that Level B software was unacceptable under FAA standards, while Alternative was completely in the dark. However, this hardly appears to be the case. For one, Level B software was perfectly acceptable under the UK's standards. Second, correspondence in the record demonstrates that even the FAA's engineers did not regard Level B software as completely unacceptable. *See* Joint App'x at 524 (email from the FAA's Gregory Dunn, stating "I believe that level B [software] is allowed under certain circumstances. Note FAA allowances for level B may be different than JAA [the European Joint Aviation Authorities] requirements."); *id.* at 330 (email from the FAA's Brenda Ocker stating that she was not making a "general policy statement" that Level A software was always required, but rather, she found that in this particular installation, it was). The fact that the FAA ultimately decided not to certify Level B software for use in this particular application, while unfortunate, does nothing to help Alternative's private contract dispute with Meggitt.

> (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336 (Mich. 1976) (quoting *Candler v. Heigho*, 208 Mich. 115, 121 (Mich. 1919)). If even one of these elements is absent, the plaintiff will not prevail on a fraud claim. *Id.*

With respect to the claim that Meggitt misrepresented that its system was flight certified, Alternative cannot prevail, for at the very least, the second element of fraud — that Meggitt made false statements — is absent. Meggitt's statements that its altimeters were already flight certified in some aircraft were not false because — as Alternative knew — the Civil Aviation Authority had already certified that particular altimeter for use in VC-10 aircraft.

Alternative's second claim — that Meggitt misrepresented its system was "RVSM-compliant" — also fails. As explained *supra*, Alternative's argument that Meggitt guaranteed its system was "RVSM-compliant" is the same as arguing that Meggitt guaranteed future FAA approval. With this interpretation of its claim in mind, Alternative cannot prevail because "[a]n action for fraudulent misrepresentation must be predicated on a statement relating to a past or an existing fact. Future promises are contractual and cannot constitute actionable fraud." *Eerdmans v. Maki*, 226 Mich. App. 360, 366 (Mich. Ct. App. 1997) (citation omitted). With respect to the specific aspects of the altimeter that failed to obtain FAA approval, the record reveals that Meggitt had no idea that Level B software would render its product uncertifiable. The same can be said for the failure to comply with HIRF special conditions. Alternative's argument that Meggitt knew Level B software was unacceptable is simply an unfounded accusation that has no support in the record. Further, Alternative quotes Meggitt as claiming that its equipment was the "[s]olution to *most* Retrofit programs." Appellant's Br. at 48 (emphasis added). Stating that your product is a solution to "most" programs is by no means a promise that the product will be certified. Given the knowledge Alternative had about Meggitt's product, and the fact it was Alternative's — not Meggitt's — duty to obtain FAA certification, Alternative's reliance upon Meggitt's statements as a guarantee of future RVSM-compliance is simply unreasonable. *See Nieves v. Bell Indus.*, 204 Mich. App. 459, 464 (Mich. Ct. App. 1994) ("A misrepresentation claim requires *reasonable* reliance on a false representation.") (emphasis added); *see also Warkentien v. Vondracek*, 633 F.2d 1, 5 (6th Cir. 1980) (holding that defendants could not be held liable for false representation when their statements to plaintiffs were, at most, a "promise" of what a government employee would allow plaintiffs to do in the future).

V

Alternative claims that its December 27, 2002, revocation of acceptance was timely. It maintains that the relevant time period began in August 2002, when Meggitt admitted it could not cure before the end of 2003, and it should be up to a jury to decide whether it was commercially reasonable to wait until December to revoke. On the other hand, Meggitt argues that the clock began to tick when the FAA raised the software level issue in April 2002, and that it was not commercially reasonable for Alternative to wait eight months before revoking acceptance.

Pursuant to Mich. Comp. Laws § 440.2608, a buyer may revoke acceptance of goods when a nonconformity substantially impairs the goods' value if he has accepted it:

> (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

> (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

The buyer must revoke acceptance within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial changes in the condition of the goods are made (not caused by their own defects). Mich. Comp. Laws § 440.2608(2). Thus, even if Alternative notified Meggitt of its revocation of acceptance within a commercially reasonable time, it would not be able to revoke its acceptance if Alternative had substantially changed the condition of the altimeters.

In *Eaton Corp. v. Magnavox Co.*, 581 F. Supp. 1514 (E.D. Mich 1984), a district court within our Circuit evaluated this "substantial changes" provision in a similar case. Plaintiff Eaton sought to revoke acceptance of controllers it purchased from Magnavox. *Id*. at 1529. These controllers had already been installed on its customers' trucks and were being used by these customers. *Id*. The court found that "[t]he sale, installation, and use of the controllers constituted a 'substantial change in condition of the goods' which was not caused by any defect in the controllers, and it therefore precluded Eaton from subsequently revoking its acceptance." *Id*. (citing Mich. Comp. Laws § 440.2608(2)). The court further noted that because Eaton's customers, and not Eaton, had possession of a majority of the controllers, it could not fulfill its duty after revocation to hold the goods for a reasonable time in order to allow seller Magnavox to take back the goods. *Id*. at 1529-30. Similarly, here, it appears that Alternative's customers still have possession of, and continue to use, Meggitt's equipment. Joint App'x at 323-27 (12/7/04 deposition of John Shirk). It does not appear that Alternative has affirmatively acted to uninstall the equipment in order to allow Meggitt to take it back. We find the reasoning in *Eaton* persuasive and hold that despite Alternative's words regarding its revocation of acceptance, it has not fulfilled its duty to make the goods available for Meggitt to remove.

It is also worth pointing out that regardless of when Alternative should have informed Meggitt of its revocation, Alternative's conduct does not appear to be that of a party acting in a reasonable or timely manner. Most telling is the fact that in April 2002, Alternative was informed that the FAA would not certify the equipment because it did not use Level A software. Yet the record shows that even with this knowledge, Alternative proceeded to install *two more* systems in customers' aircraft on May 24, 2002, and June 3, 2002. Thus, Alternative acted unreasonably even when faced with a substantial likelihood that the FAA would deny approval.

VI

In its appeal of the district court's grant of summary judgment to Meggitt on its counterclaim for payment of the unpaid portion of the invoice, Alternative simply argues that because we should reverse summary judgment on its contracts claims, it necessarily follows that we should vacate the district court's award of damages to Meggitt. However, because we find that Meggitt did not breach the contract, we hold that Meggitt is entitled to the unpaid balance of $240,860 plus prejudgment interest of $18,863.72.

For the reasons above, the judgment of the district court is **AFFIRMED**.